Imam 'Shahid **MUHAMMAD**, Appellant,

v.

Norm **CARLSON**, U.S. Federal Bureau of Prisons; C.A. Turner, Warden; Robert Brutsche; Joseph S. Petrovsky; George Killinger; Wayne Seymore; Alice Conroy; E. Stanley Nelson, M.D.; Donald Lieberwitz, M.D., Appellees.

No. 87–1137.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 13, 1987.

Decided April 26, 1988.

Rehearing and Rehearing En Banc Denied July 21, 1988.

Kirk T. May, Kansas City, Mo., for appellant.

Robin Aiken, Springfield, Mo., for appellees.

Before FAGG, Circuit Judge, BRIGHT, Senior Circuit Judge, and MAGILL, Circuit Judge.

MAGILL, Circuit Judge.

Imam 'Shahid Muhammad ("Muhammad"), a prisoner at the United States Medical Center for Federal Prisoners in Springfield, Missouri ("MCFP"), appeals the district court's [1] dismissal of his *pro se* complaint, arguing that medical regulations governing his placement in the AIDS [2] unit at MCFP endowed him with a "liberty interest" under the Due Process Clause of the Constitution. Because we believe that Muhammad asserts an interest too insubstantial to trigger due process protection, we affirm the district court's dismissal of his complaint.

I. BACKGROUND.

Muhammad, a prisoner at Leavenworth Federal Prison, was transferred to MCFP because he had lost coordination in his legs and right hand. Blood tests indicated that Muhammad had developed antibodies against the AIDS virus. Pursuant to the Bureau of Prison regulations (the "Operations Memorandum" and "Institution Supplement"), Muhammad was classified as Pre–ARC [3] and was placed in the restricted

---

1. The Honorable William R. Collinson, Senior United States District Judge for the Western District of Missouri.

2. AIDS is the accepted acronym for Acquired Immune Deficiency Syndrome, a disease characterized by infection with Human T-cell lymphotrophic virus type three (HTLV–III virus). To avoid confusion, we will refer to the HTLV–

III virus as the AIDS virus throughout this opinion.

3. In the Operations Memorandum, AIDS is defined as the [AIDS] virus plus opportunistic secondary infections like cancer or pneumonia, which take advantage of the immunological system's reduced ability to fight off disease; ARC (AIDS Related Complex) is defined as infection

AIDS unit at MCFP without a hearing, where he was isolated from the general inmate population. Approximately seven months later, the Bureau of Prisons changed its regulations and released Muhammad and other restricted inmates back into the general prison population at MCFP.

Muhammad brought a *pro se* complaint, contending that his transfer to, and seven-month confinement in, the restricted AIDS unit violated his due process rights to a hearing, and stigmatized him. The district court found that the complaint failed to allege conduct rising to the level of a constitutional violation and dismissed the complaint. Although we recognize that Muhammad's *pro se* pleadings are entitled to a liberal construction, we nevertheless hold that Muhammad's due process claim fails as a matter of law, and was properly dismissed by the district court.

## II.  DISCUSSION.

We begin with the familiar proposition that a liberty interest protected by the Due Process Clause of the Fifth Amendment may arise from two sources—the Due Process Clause itself and laws of the United States. *Cf. Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Muhammad does not contend that the Due Process Clause itself creates an interest in being confined in the general penitentiary population, nor do we believe he could. *See Hewitt*, 459 U.S. at 466–67, 103 S.Ct. at 868. Instead, he claims a liberty interest in prison medical regulations that establish procedures for the diagnosis, treatment and isolation of AIDS carriers.

This court's decisions establish that a liberty interest may be created by prison regulations, *Parker v. Corrothers*, 750 F.2d 653, 656 (8th Cir.1984), if those regulations impose substantive criteria which limit or guide the discretion of prison officials.

*Id.* By contrast, a liberty interest is not created by a regulation which accords prison officials "unfettered discretion," *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 466, 101 S.Ct. 2460, 2465, 69 L.Ed.2d 158 (1981), or authorizes prison officials to act "for whatever reason or no reason at all." *Meachum v. Fano*, 427 U.S. 215, 228, 96 S.Ct. 2532, 2540, 49 L.Ed. 2d 451 (1976).

Whether the regulation is intended to limit the decision-making of prison officials or merely sets forth procedural guidelines for the exercise of authority, depends in large part upon the language of the regulation at issue and the nature of the predicates, if any, for exercise of that authority. Use of language of an "unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed," *Hewitt*, 459 U.S. at 471, 103 S.Ct. at 871, coupled with what the Supreme Court terms "specific substantive predicates," *id.* at 472, 103 S.Ct. at 871, indicates an intent to trammel prison officials' discretion, and thus creates a liberty interest entitled to some degree of constitutional protection. *Id.*

■ With these principles in mind, we turn to the regulations Muhammad claims give rise to a liberty interest. Muhammad first urges that he has a liberty interest in his Pre–ARC classification because the regulations in both the Operations Memorandum and the Institution Supplement set forth specific criteria which limit the action prison officials could take in testing for the AIDS virus, as well as in classifying and housing inmates based on the test results. Muhammad points to the following provisions, among others, to make his argument: (1) language in the Operations Memorandum which provides that "[t]esting for the [AIDS] antibodies shall be performed only when determined by the Chief of Health Programs to be clinically indicated"; (2) the definition of "Pre–ARC" in the Operations Memorandum, which specifies that individ-

---

with the [AIDS] virus plus damage to the body's immunological system, but no secondary infections; Pre-ARC is defined as a confirmed positive blood test for infection with the [AIDS]

virus plus one or more symptoms of AIDS but no conclusive damage to the body's immunological system.

uals must "have a *confirmed positive* blood test for infection with the AIDS virus and have at least one symptom/sign" (emphasis in original); (3) language in the Operations Memorandum which states "Pre-ARC cases must be discussed with the Medical Director"; and (4) language in the Institution Supplement which provides "Pre-ARC's * * * will ordinarily be transferred to [the restricted unit]." Muhammad argues this is language of an "unmistakably mandatory character," *Hewitt,* 459 U.S. at 471, 103 S.Ct. at 871, which creates a liberty interest.

■■■ It is apparent, however, that the "mandatory" language Muhammad relies upon relates only to the actual medical procedures for the diagnosis, treatment and isolation of AIDS-infected inmates. There is no language in these regulations from which a prisoner could reasonably expect that he would not be transferred to the AIDS unit without a chance to challenge his medical classification,[4] *see Vitek v. Jones,* 445 U.S. 480, 488–91, 100 S.Ct. 1254, 1261–62, 63 L.Ed.2d 552 (1980). Nor do the regulations specify any substantive limitations on prison officials' discretion in transferring an inmate to the AIDS unit once a medical evaluation has been made, as is required under *Hewitt,* 459 U.S. at 472, 103 S.Ct. at 871. It bears repeating that the transfer of inmates to more restricted quarters for nonpunitive reasons implicates no due process protections, *id.* at 466–67, 103 S.Ct. at 868, as long as the conditions or degree of confinement are within the purview of the sentence imposed and do not otherwise violate the Constitution. *Id.* at 468, 103 S.Ct. at 869. This is especially the case here, where the transfer has the legitimate purpose of isolating suspected AIDS carriers for diagnostic, treatment and security purposes. *Judd v.*

*Packard,* 669 F.Supp. 741, 743 (D.Md.1987); *Powell v. Department of Corrections, State of Oklahoma,* 647 F.Supp. 968, 971 (N.D.Okla.1986); *Cordero v. Coughlin,* 607 F.Supp. 9, 10 (S.D.N.Y.1984). While it is undoubtedly true that Muhammad has been stigmatized by his Pre-ARC classification, that stigma arises primarily from public fear of, and misunderstanding about, the disease, not from the prison medical officials' conduct. Moreover, it has never been enough to argue that a classification has been made; the claimant must also allege some judicially cognizable injury stemming from that classification. *University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Muhammad does not allege that the conditions of the confinement resulting from his Pre-ARC classification violated any right preserved by the Constitution, nor does he allege any facts that, if nurtured by additional discovery proceedings, might blossom into an equal protection claim. Muhammad's argument must fail because he alleges no constitutionally impermissible classification, and no cognizable injury resulting from his medical status.

■■■ Muhammad also claims a liberty interest in regulations governing placement of prisoners in "administrative detention," 28 C.F.R. § 541.22–23 (1987), because he was isolated in the AIDS unit without a hearing.[5] It is clear from the record, however, that Muhammad's segregation was medically directed, and not the result of a discretionary administrative decision. The administrative detention regulations, while admittedly couched in "unmistakably mandatory" language, do not apply to medical determinations regarding isolation and segregation of infected and exposed inmates. Contrary to the situation contemplated by the regulations, Muhammad was not con-

---

**4.** It would be an extraordinary regulation that would allow Muhammad to insinuate himself in the diagnostic procedure by challenging his medical classification, for such a regulation would have to provide inmates the opportunity for a second medical opinion in order to be effective. If such a regulation exists, it has not been brought to our attention.

**5.** Although he has been released from the AIDS unit at MCFP, Muhammad claims damages for

the alleged violation of his due process right to a hearing under the constitutional tort doctrine announced in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Because we hold that Muhammad does not have a liberty interest in the prison regulations he relies on to make his claim, we do not decide whether or not abrogation of a right to a hearing is compensable under the *Bivens* doctrine.

fined for disciplinary reasons, nor was he singled out for individualized protection measures. *See* 28 C.F.R. § 541.22–23; *Hewitt*, 459 U.S. at 463 n. 1, 103 S.Ct. at 867 n. 1. His reliance on this disciplinary regulation is thus misplaced, for no disciplinary action was taken against him. Accordingly, we decide that Muhammad had no liberty interest in these administrative detention regulations.

In closing, we emphasize that our refusal to find a liberty interest in procedures established for identifying, treating and isolating prisoners carrying the AIDS virus stems from more than just our reluctance to hinder prison officials' attempts to cope with the extraordinarily difficult problems AIDS poses in a prison setting. We believe the prison medical procedures at issue were not intended to limit prison officials' *administrative* discretion, and the language setting forth the procedures supports our conclusion. More importantly, Muhammad's transfer to the AIDS unit was due to his medical condition, and not to any misbehavior, or need for individualized protection. *Judd,* 669 F.Supp. at 743. Accordingly, the decision of the district court dismissing Muhammad's complaint is affirmed.[6]

---

**6.** We wish to thank Muhammad's appointed counsel, Kirk T. May, for the excellent representation he provided.