John DOE, on behalf of himself and
all others similarly situated,
Plaintiff,

v.

Thomas A. COUGHLIN, III, Commission-
er, and Raymond Broaddus, Ph.D., As-
sistant Commissioner for Health Ser-
vices, Defendants.

No. 88–CV–964.

United States District Court,
N.D. New York.

Oct. 14, 1988.

Prisoners' Legal Services of New York,
Poughkeepsie, N.Y., for plaintiff; John
Gresham, Geri Pomerantz, Ken Stephens,
Law Graduate, of counsel.

Robert Abrams, Atty. Gen. of State of
N.Y., Albany, N.Y., for defendants; Alan
S. Kaufman, Bruce D. Feldman, Asst. At-
tys. Gen., of counsel.

## MEMORANDUM—DECISION & ORDER

MUNSON, District Judge.

This court is today presented with the
difficult task of first determining the na-
ture and extent of the privacy rights of
inmates who have tested positive for expo-
sure to the Human Immunodeficiency Vi-
rus (HIV) [1] and then balancing that privacy

---

1. HIV infection is believed to weaken the body's
immune system by destroying certain white

blood cells known as T-helpers which are the
body's principal weapons for fighting infection

interest against the asserted interest of the New York State Department of Correctional Services ("DOCS") in establishing a dormitory to house such inmates, all of whom will be transferred there involuntarily. That dormitory is known as "D–2" and is located in the Greene Correctional Facility in Coxsackie, New York. Inmates are purportedly placed in D–2 in order to facilitate and improve the medical care provided them, and to effectuate cost reductions related to the transportation of these prisoners for treatment at the Albany Medical Center. Presently there are 21 HIV positive inmates housed in D–2; all arrived on September 15, 1988, shortly before the cut-off hour set by this court in an order temporarily restraining any further transfers of HIV positive inmates to that dormitory.[2]

▆ Plaintiff John Doe is an inmate currently confined in the general population of one of New York State's medium security correctional institutions who has tested positive for exposure to the HIV virus.[3] Doe seeks to pursue this action on behalf of a class of inmates confined in the correctional facilities of New York State who have been or will be selected by DOCS to be housed in any separate dormitory set aside at Greene Correctional Facility for inmates who have tested positive for HIV or who have acquired immune deficiency syndrome ("AIDS") or AIDS related complex ("ARC"). Although a motion for certification has not been made, the court will exercise the power given it by Fed.R.Civ.P. 23(c)(1) to certify class actions "as soon as practicable after the commencement of an action brought as a class action." *See Gore v. Turner,* 563 F.2d 159, 166 (5th Cir.1977); 7b C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 2d,* § 1785 at 90–91 (1986). In exercising that power, the court has weighed carefully the factors identified as central to a certification decision.[4]

and disease. The weakening of the body's immune system permits certain opportunistic diseases to further weaken the body. In its most advanced stage, HIV induced disease is referred to as full blown acquired immune deficiency syndrome ("AIDS"). An intermediate stage of the disease is known as AIDS related complex ("ARC"). Throughout this opinion, when the court uses the term AIDS it is referring to all three stages of the disease.

2. The court was presented with plaintiff's request for a temporary restraining order on the day that approximately 50 inmates from various prisons within New York State were slated for transfer to D–2. By the time the parties could discuss the circumstances of the transfer with the court, thereby allowing the court to determine the appropriateness of granting the temporary restraining order, it was apparent that many inmates were either at Greene or soon to arrive. The court set a midnight deadline after which no further transfers could be made.

3. Although he has not yet been transferred to D–2, Doe clearly has standing to maintain this action. In order to satisfy the "case or controversy" prerequisite of Article III of the Constitution, "the plaintiff must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975). Doe is a member of the class of inmates subject to involuntary placement in D–2, and during the preliminary injunction hearing DOCS officials unambiguously maintained that they intended to go forward with their program of placing HIV positive inmates in D–2. Such placement would effectively reveal Doe's medical condition to third parties without his consent, and accordingly cause him real and palpable injury.

4. In this case a class action is maintainable under Fed.R.Civ.P. 23(a) & (b)(2). As a threshold matter, the court notes that "the proposed class and its members are 'clearly defined and identified with particularity,'" and that plaintiff John Doe is a member of this class. *Follette v. Vitanza,* 658 F.Supp. 492, 505 (N.D.N.Y.1987) (citations omitted). Moreover, the putative class meets all of the requirements of subdivision (a) of Rule 23. It is apparent, given the evidence and testimony received at the injunction hearing which established that there are approximately 400 known cases where inmates have tested positive for the HIV virus, that the proposed class is "so numerous that joinder of all members is impracticable." *See* Fed.R.Civ.P. 23(a)(1). The questions of law concerning the right to privacy and the reasonableness of the transfer program are common to the proposed class members while differences in factual circumstances are legally insignificant. *See* Fed.R.Civ.P. 23(a)(2). The claims and defenses of each member of the class arise from the same course of conduct on the part of defendants and are based on a common legal theory, thus satisfying the typicality requirement of Fed.R.Civ.P.

In making its ultimate decision on the requested injunctive relief this court treads on relatively unexplored territory. In prior cases, prisoners have typically rested their attacks on such segregated housing on either the due process or equal protection clauses of the fourteenth amendment to the United States Constitution. *See, e.g., Cordero v. Coughlin,* 607 F.Supp. 9, 10–11 (S.D.N.Y.1984) (rejecting first, eighth and fourteenth amendment challenges to plan segregating AIDS patients from other inmates). Perhaps chastened by the uniform failure of these attacks, plaintiff has chosen the less travelled path marked by the uncertain borders of the constitutionally protected right to privacy. Plaintiff faces an uphill battle. Not only must he demonstrate the existence of the right to privacy, but he must also show that the program as it now exists is not reasonably related to a legitimate penological objective. *See Turner v. Safley,* — U.S. —, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987).

In this Memorandum—Decision and Order the court is not making a dispositive ruling on the merits of the action. Plaintiff merely seeks preliminary injunctive relief. In the Second Circuit it is well established that a party is entitled to such relief upon making either of two showings. Under either alternative, the party must first demonstrate that the injunctive relief is necessary to prevent irreparable injury. Upon meeting this initial burden, the movant must establish either that he is likely to prevail on the merits of the underlying controversy or that there exist sufficiently serious questions going to the merits as to make them a fair ground for litigation, together with a balance of hardships tipping decidedly toward the movant. *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979).

An essential component of plaintiff's argument for injunctive relief is his belief that placement in a dormitory such as D–2 should be voluntary, based on an informed decision made by the inmate. Implicitly, plaintiff recognizes that a properly designed program which segregates patients with AIDS is a worthy objective. It is the involuntariness of the program challenged here that plaintiff believes causes the infringement of his right to privacy.

In determining whether to grant the relief plaintiff seeks, the court first must identify the privacy right implicated by the involuntary transfer of HIV positive inmates to the segregated dormitory. Defendants choose to characterize that asserted right as "the right to keep confidential the possible incidental communication of an inmate's medical diagnosis as a result of a decision by [DOCS] to house the inmates in a particular dormitory." This characterization is only partly correct. Certainly any communication of the inmate's medical diagnosis can be said to be incidental in

23(a)(3). *See Dura–Bilt v. Chase Manhattan Corp.,* 89 F.R.D. 87, 89 (S.D.N.Y.1981). And plaintiff's attorney, Prisoners' Legal Services, is probably the most qualified representative the plaintiff class could have, given their vast knowledge of and experience with New York State's correctional system. *See* Fed.R.Civ.P. 23(a)(4).

Finally, it is clear that defendants have "acted or refused to act on grounds generally applicable to the class" as required by subdivision (b)(2). Nonetheless, to meet the Second Circuit's prudential requirements concerning (b)(2), the plaintiff must also demonstrate the existence of "additional reasons for obtaining certification." *Davis v. Smith,* 607 F.2d 535, 540 (2d Cir.1979). This is particularly so when declaratory or injunctive relief is sought against public officials who indicate that they will not honor a decree for prospective relief in cases involving members of the plaintiff class other than the named class representative. *See Galvan v. Levine,* 490 F.2d 1255, 1261–62 (2d Cir. 1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2652, 41 L.Ed.2d 240 (1974). No assurances have been made on the record in this case, and it appears that DOCS would indeed refuse to refrain from transferring inmates to D–2 without a court order.

There are peculiar circumstances involved in this case: the members of the plaintiff's class wish to maintain anonymity. If the court does not allow a class action to go forward here, individual class members could face the prospect of having their identity and diagnosis revealed if they chose to protect their rights by filing a lawsuit. *Maintaining the anonymity of class members—particularly those that testify— is difficult enough in a single class wide suit such as this.* Accomplishing the same in multiple lawsuits would present even greater difficulties.

that it would most likely be occasioned by a visual identification of the inmate with those housed in D-2 or by one of several avenues of communication, none of which would be instigated by prison officials.[5] Nonetheless, the right asserted here is not properly described by the narrow language chosen by defendants. The means by which the communication is revealed, the "incidental communication," does not define the right; it merely summarizes the circumstances surrounding the disclosure. Quite simply, plaintiff asserts a right to privacy in preventing the non-consensual disclosure of his medical diagnosis and that of the other class members.[6]

So defined, that right must be analyzed in light of existing interpretations of the right to privacy. The cases setting forth the general parameters of that right are legion. *See, e.g., Carey v. Population Services International*, 431 U.S. 678, 684–85, 97 S.Ct. 2010, 2015–16, 52 L.Ed.2d 675 (1977); *Whalen v. Roe*, 429 U.S. 589, 598–600, 97 S.Ct. 869, 875–76, 51 L.Ed.2d 64 (1977). In *Whalen*, Justice Stevens spoke for a unanimous court when he identified two interests encompassed by the right to privacy. "One is the individual interest in avoiding disclosure of personal matters,[7] and another is the interest in independence in making certain kinds of important decisions." [8] *Whalen v. Roe*, 429 U.S. at 599–

600, 97 S.Ct. at 876–77. Both of these interests are directly implicated by the state's program.

Those who are currently at D-2 and those who would be placed in D-2 all share a common characteristic. Each is fully aware that he is infected with a disease which at the present time has inevitably proven fatal. In the court's view there are few matters of a more personal nature, and there are few decisions over which a person could have a greater desire to exercise control, than the manner in which he reveals that diagnosis to others. An individual's decision to tell family members as well as the general community that he is suffering from an incurable disease, particularly one such as AIDS, is clearly an emotional and sensitive one fraught with serious implications for that individual. Certain family members may abandon the AIDS victim while others may be emotionally unprepared to handle such news. Within the confines of the prison the infected prisoner is likely to suffer from harassment and psychological pressures. Beyond the prison's walls the person suffering from AIDS is often subject to discrimination.[9]

As Justice Stevens has observed, "the concept of privacy embodies the 'moral fact that a person belongs to himself and not others nor to society as a whole.' " *Thorn-*

---

5. For instance, family members visiting the inmate might be told by other visitors, or by guards, that the inmate is housed in the "AIDS dorm." In another scenario, inmates released from prison may return to their communities and "spread the word." Similarly, and as evidenced by the testimony of two inmates, other family members or relatives may be housed at Greene, creating an obvious potential for disclosure of the sick inmate's diagnosis. In each of these situations, the communication can be said to be inadvertent in that prison officials have not purposefully released the medical diagnosis.

6. Assuming that a right to prevent non-consensual disclosure of their medical conditions does exist, the circumstances identified by the defendants will be central to a balancing of that right against the state's interest in establishing the contested program.

7. For this proposition the Court cited *California Bankers Association v. Schultz*, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974); *Stanley v.*

*Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928).

8. Here the Court cited such cases as *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

9. The New York Legislature has recently enacted legislation which strictly limits the circumstances under which the identity of those suffering from AIDS may be revealed. The legislature's action was designed in part to limit the risk that those infected with AIDS will be discriminated against if their diagnosis is known to others. 1988 N.Y.Laws 9265-A.

*burgh v. American College of Obstetricians & Gynecologists,* 476 U.S. 747, 777 n. 5, 106 S.Ct. 2169, 2175 n. 5, 90 L.Ed.2d 779 (1986) (Stevens, J., concurring) (quoting Fried, *Correspondence,* 6 Phil. & Pub.Affairs 288–89 (1977)). Implicitly, the Court recognizes the value of making independent decisions concerning one's self. It may be even more essential for a prisoner than a person who enjoys the freedoms associated with life outside of prison, and the personal strength derived from those freedoms, that the prisoner be accorded the ability to protect and shape his identity to as great a degree as possible.[10] There is little question but that the prisoner identified as having AIDS will be severely compromised in his ability to maintain whatever dignity and individuality a prison environment allows.

The court also believes that once the prisoner leaves the prison, he should be burdened with only those residual scars imprisonment must inflict.[11] The threat to family life and the "emotional enrichment [gained] from close ties with others," *Roberts v. United States Jaycees,* 468 U.S. 609, 619, 104 S.Ct. 3244, 3250, 82 L.Ed.2d 462

(1983), is quite real when an AIDS victim's diagnosis is revealed. Ignorance and prejudice concerning the disease are widespread; the decision of whether, or how, or when to risk familial and communal opprobrium and even ostracism is one of fundamental importance. Within the jurisprudence concerning the right to privacy, and in recognition of the particularly personal nature of the information potentially subject to disclosure under the state's program, the court determines that the prisoners subject to this program must be afforded at least some protection against the non-consensual disclosure of their diagnosis. *Accord, Woods v. White,* 689 F.Supp. 874 (W.D.Wis.1988). The extent of that protection must now be considered.

In the context of prison administration, it is a "familiar proposition that 'incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974) (citing *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948)). Certainly, one

---

**10.** The court is aware that as a general rule, the privacy rights of prisoners are not as extensive as those enjoyed by individuals outside of prison. *See, e.g., Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *Bell v. Wolfish,* 441 U.S. 520, 556–57, 99 S.Ct. 1861, 1883–84, 60 L.Ed.2d 447 (1979); *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974). Nonetheless, the court is concerned about the means by which DOCS selects inmates for the contested program. Testimony at the hearing held on September 27, 1988 and October 6, 1988 established that at least some of the prisoners selected for placement in D–2 were chosen on the basis of results from voluntarily taken blood tests. Each of the prisoners who testified concerning these blood tests indicated his understanding that the test results were to be known only to his doctor, the warden and his counselor. *See* N.Y.Comp.Codes R. & Regs. tit. 7, §§ 5.24, 5.25 (1987) (limiting those persons to whom an inmate's medical records shall be made available).

Testimony from defendant Broaddus indicated that some of those chosen for placement in D–2 were selected on the basis of blood samples taken from prisoners when they were treated by physicians outside the prison. It was not made clear how that information was con-

veyed to prison officials; thus it is uncertain whether the inmates consented to the release of their medical records. Without concluding that the physician/patient relationship is one entitled to constitutional protection, the court observes that many states, including New York, have enacted statutes protecting the confidentiality of communications made between physician and patient. *See* N.Y.Civil Practice Law and Rules § 4504 (McKinney 1963, Supp.1988); *See, e.g.,* Cal.Evidence Code §§ 990 *et seq.* (West 1980); Mich.Comp.Laws §§ 600.2101–600.2952 (West 1986); 42 Pa.Cons.Stat.Ann. § 5929 (Purdon 1982); Wis.Stat.Ann. § 905.04 (West 1975, Supp.1987).

On a full hearing on the merits of this action, the court would require a fuller explanation of how DOCS compiled its list of inmates who are infected with the HIV virus. At this stage there remain serious questions concerning breaches of confidentiality, and possible pendent state law bases for attacking these breaches which would supplement the federal constitutional grounds discussed in this Memorandum—Decision & Order.

**11.** This concern is fully consistent with the legitimate penological objective of rehabilitating prisoners. *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974).

of the principal considerations is the maintenance of security within the prison. So explained, courts have upheld numerous limitations upon prisoners' rights. *See, e.g., Pell v. Procunier,* 417 U.S. at 827–28, 94 S.Ct. at 2806–07 (first amendment rights permissibly limited by regulation designed to reduce visits for security purposes); *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 132–33, 97 S.Ct. 2532, 2541–42, 53 L.Ed.2d 629 (1977) (security concerns regarding prisoners' efforts to form unions justified limitations on various first amendment rights); *Bell v. Wolfish,* 441 U.S. 520, 556–57, 99 S.Ct. 1861, 1883–84, 60 L.Ed.2d 447 (1979) (pre-trial detainee's reasonable expectation of privacy within cell based in the fourth amendment lessened in deference to security measures); *Block v. Rutherford,* 468 U.S. 576, 586, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984) (limitations on contact visits upheld in deference to security concerns).

In summarizing the rationale of these cases, and in the interest of stating definitively what standard should govern review of prison regulations in such cases, the Supreme Court has recently stated that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 107 S.Ct. at 2261. In *Turner,* the Court set out a four part test designed to guide a court's application of this reasonableness standard. First, there should be a " 'valid rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner,* 107 S.Ct. at 2262 (quoting *Block v. Rutherford,* 468 U.S. at 586, 104 S.Ct. at 3232). Second, the court must determine "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* Third, there should be "consideration [of] the impact accommodation of the asserted constitu-

tional right will have on the guards and other inmates, and on the allocation of prison resources generally." *Id.* Finally, the court should determine the availability of other, ready alternatives. *Id.* Concerning this final factor, the *Turner* Court emphasized that it was not setting up a "least restrictive alternative" test. The reviewing court may consider the availability of an "alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests [as evidence] that the program does not satisfy the reasonable relationship standard." *Id.*

Before considering the reasonableness of the program DOCS seeks to impose, the court notes that the defendants have asserted only one relatively incidental security rationale for this program.[12] Moreover, it is clear that what DOCS seeks to institute at Greene is not a regulation directed at limiting any specific conduct on the part of inmates, the typical subject of regulations infringing constitutional rights. *See, e.g., Id.* at 2262–67 (upholding limitations on inmate-to-inmate correspondence; striking regulation burdening inmate's right to marry). The privacy right at issue in this case is passive in nature, and does not involve an inmate's affirmative conduct. Thus, this case is somewhat distinguishable from those which led to *Turner,* and from *Turner* itself. Nonetheless, *Turner* does provide a good starting point for the court's analysis of the program.

The general parameters of the program were revealed to the court during two days of hearings. DOCS has cleared D–2, an open dormitory housing unit, of all its inmates for the purpose of providing bed space for 50 inmates who are HIV positive. Each of the affected inmates is ambulatory, and in correctional parlance, is said to be "fully programmable". Each will be eligible to participate in and intermingle

---

**12.** As a general rule, guards at Greene Correctional Facility are not stationed within the dormitories during the hours when prisoners are in program other than when necessary to supervise inmate porters as they clean the dormitories. Defendants propose placing a guard within D–2 during regular programming hours, en-

abling those inmates who tire during programming to return to their beds. Thus, while a security objective is served in that the inmate can then be watched, that inmate would not be in D–2 in the first place were it not for the medical objective of providing better care for the inmates.

with other prisoners during all activities conducted outside the dormitory. Thus there is no suggestion that these prisoners are being segregated in order to protect others from infection with the virus.

It is the state's intention to provide a trained counselor who apparently will be available to the D–2 inmates for at least one shift during the day. Nursing care will be available for 16 hours per day from a person stationed within the dormitory. The state also indicates that a correctional officer will be stationed within D–2 during the day so that any inmate who tires during programming can be escorted back to his bed and guarded while he rests. All other dormitories remain closed during programming.

Perhaps of greatest significance to the well-being of the prisoners, DOCS indicates that a clinic will be established at the prison for the treatment of the inmates in D–2 and others within the state system. The clinic will be established in conjunction with the Albany Medical Center, a leading facility in the treatment of AIDS. Currently, state prisoners needing treatment for the virus are transported to the medical center from numerous prisons to the north and west of Albany. Many of these prisoners face long hours of possibly debilitating transport. Meanwhile, DOCS incurs transportation expenses which could be greatly reduced if the AIDS patients were centrally located at Greene given that facility's proximity to the Albany Medical Center.[13]

Turning to the first prong of the *Turner* framework,[14] it is readily apparent that DOCS seeks to further legitimate interests through the program. Improving and expediting medical care for inmates with AIDS is not only a desirable objective, it is a highly commendable one. Similarly, the effectuation of budget reductions through the elimination of certain transportation costs can only benefit the prison system by making funds available for other programs, or for the state's other budget needs.

■ Unfortunately, these objectives are served in a constitutionally impermissible manner. Without question, those assigned to D–2 will be known by guards and the general prison population to be infected by the HIV virus.[15] And as noted earlier, these inmates also face a substantial risk of having their diagnosis revealed to family

---

13. There are currently 10 regular care and 2 intensive care beds in the infirmary at Greene. With the influx of approximately 50 additional prisoners, some of whom will need bed rest, the infirmary's resources would probably become overtaxed were it not for the 24 hour availability of bed space in D–2.

14. The second *Turner* factor is not applicable in this case. Plaintiff does not seek to exercise a right, he merely seeks to protect his right to privacy. DOCS, in turn, has not directly regulated prisoner conduct. To the extent that other alternatives are weighed, the court will wait until it reaches the final *Turner* factor.

Consideration of the third *Turner* factor is subsumed within the court's discussion of the first factor.

15. Commissioner Coughlin testified that he was sure everyone in Greene knew that D–2 housed inmates with AIDS. The commissioner also indicated that he would not be surprised if the dorm were called "the AIDS dorm," evidently in reference to language utilized by prisoners, and possibly by guards.

The inmates who testified indicated that they were frequently made the target of taunts and threats, some quite serious, because of their condition. When the dormitory's inmates arrive at the mess hall, their designation, D–2, is announced. While a similar announcement is made with respect to all dormitories, the other inmates evidently do not receive the abusive treatment levied at D–2's inmates.

The court does not pretend that a prison is a comfortable place in which a prisoner should expect to be free from the uncivilized behavior men impose on their fellow men. Nonetheless, as concerns the defendants' argument that D–2 allows DOCS to provide the AIDS inmate with a supportive environment which ultimately will benefit their health, the court finds disturbing certain of the concerns testified to by the plaintiff's medical expert, Victoria Sharpe, M.D. Doctor Sharpe is intimately involved with the treatment of AIDS, both in the general population and with New York State's inmate population. She believes that the imposition of psychological pressure on individuals with AIDS may harm their health. These deleterious effects are potentially amplified when visited upon those who have had their condition revealed after having been involuntarily placed in Greene, and after having enjoyed anonymity in the prison from which they came.

members and friends.[16] To justify these invasions, the state argues that its program is the most appropriate means of accomplishing its interests. As noted, inmates within D–2 who need treatment do realize one significant benefit; even without the establishment of a clinic within Greene, these prisoners can be treated at Albany Medical Center without the rigors of many hours of travel. Concomitantly, DOCS saves on transportation costs and eliminates some of the logistical concerns associated with the bringing of prisoners to the medical center. Nonetheless, these benefits are insufficient standing alone to warrant permitting infringement of the prisoner's right to privacy.

Before stating the reasons for this determination, the court emphasizes that it undertakes its analysis, and considers the alternatives available to DOCS not for the purpose of instructing DOCS how to run its prisons. The court is fully aware of the oft-stated admonition concerning the limited role courts should take when the administration of prisons is at issue. *See, e.g., Turner v. Safley*, 107 S.Ct. at 2259. Notwithstanding that admonition, the court is also cognizant of "an alternative that fully accommodates the prisoner's rights at *de minimis* cost to [the department's interests]." *Id.* at 2262.

As observed earlier, plaintiff does not disagree with the concept of establishing a dormitory for the housing of prisoners in need of treatment for AIDS. His objection centers on the involuntary placement of inmates in D–2; his solution hinges on granting to the inmates the right to choose whether they wish to be housed in D–2. In effect, plaintiff argues that inmates ought to retain the power to make an informed decision as to a waiver of their constitutional right to privacy. Testimony from two of the defendant's witnesses makes clear that the inmate's objective can be achieved at only a *de minimis* cost. Commissioner Coughlin testified that D–2 is primarily a diagnostic dormitory. At some point, presumably within a short period after arrival at Greene, the inmate is examined by medical personnel for a determination of whether he is in need of what the commissioner characterized as "treatment." It is apparent that the commissioner did not mean treatment generally, but rather that he was considering the treatment which he believes will ultimately be available in D–2 since at least some of those in D–2 were already receiving some type of treatment for their condition before they arrived at Greene. The commissioner testified that after diagnosis, the medical staff might determine that the inmate should not be placed in D–2, or that even if his condition warranted placement there, DOCS would honor an inmate's informed decision [17] to refuse such treatment.[18] In either case,

---

**16.** One inmate testified that soon after a near relation housed in Greene saw him in Greene the sick inmate's family learned he had AIDS. The inmate stated that he had not yet made the decision to inform his family. He believes that his family learned of his diagnosis from the near relation's family who in turn were told by the near relation.

**17.** By informed decision the defendants evidently mean a decision made after medical diagnosis and after the benefits and drawbacks of D–2 are explained to the inmate by trained personnel.

**18.** Commissioner Coughlin testified as follows:
   Q: Well, I take it it's also your position that inmates do not have a right to refuse the benefits which you're offering them in dormitory D–2?
   A: Oh, I think if the inmate after evaluation says I don't want this treatment, then I'll move him from D–2;

   Q: We got 21 people in there right now, Mr. Coughlin, are you willing to move them out?
   A: After evaluation. Remember, Mr. Gresham, this is a diagnostic unit. If they are seen, our physicians in their medical judgment feel that these people should be seen, if after they've seen, they are seen by Albany Medical Center and Albany Medical Center says that these people are not appropriate for treatment, then they'll be moved out. If ...
   Q: Let's suppose ...
   A: Can I finish my answer? If after they're seen and Albany Medical Center says they are appropriate for treatment, and the inmate says I don't want the treatment, then I'll move him out.
   Q: You certainly aren't according the inmate a right to refuse being transferred there in the first place?
   A: He doesn't have the right, Mr. Gresham.

the inmate would no longer be housed in D-2, yet his privacy rights would have been violated.

As a solution to this predicament, the plaintiff proposes that the informed decision be made before the prisoner is brought to Greene. Testimony of defendants' medical expert, Thomas Fordham Brewer, M.D., indicates that the principal difficulty with such a proposal is the systematic unavailability of personnel trained to diagnose and then counsel the prisoner. Thus, argues Brewer, a central facility must be developed at which qualified personnel can inform the inmates of their alternatives. This court does not question Brewer's conclusion. Nonetheless, implicit in his testimony, and quite evident from the testimony of Commissioner Coughlin, is the fact that the inmate will be granted the option of deciding whether to remain in D-2. Undeniably then, what DOCS is truly seeking is the right to place an inmate in D-2 involuntarily during the period when his diagnosis is undertaken and prior to the time when an informed decision can be made.

Returning briefly to consideration of the benefits currently realized by the program at Greene, it appears abundantly clear that those benefits can be realized equally well through placement of inmates in general population at Greene prior to the time when he can make his informed decision. Without any of the stigma arising from placement in D-2, DOCS will still have the well recognized right to involuntarily transfer to Greene those prisoners it believes may benefit from the program in D-2. *See, e.g., Hewitt v. Helms,* 459 U.S. 460, 468, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983) (transfer of an inmate to less amenable quarters for non punitive reasons within power of prison authorities). Moreover, DOCS will be fully able to conduct its diagnosis and counsel the prisoner regardless of where the inmate is housed within Greene. The prisoner, in turn, will not be stigmatized unless he chooses to be housed in D-2.

The court is unaware of what the expected turnover rate will be in D-2; nonetheless, with a total of only 50 beds, that turnover will evidently not be great. There is simply no reason why DOCS can not, once the program is fully operational, place a sufficient number of prospective D-2 inmates within the general population, undertake the necessary diagnostic procedures, and thereby retain a pool of inmates ready to accept a bed in D-2 when one becomes available. All of the identifiable benefits will be realized; and there will, at worst, only be a *de minimis* impact on the program. Moreover, DOCS will eliminate what strikes the court as the very real and disturbing prospect of permanently stigmatizing an individual solely for the purpose of determining if he might benefit from placement in D-2.

Finally, before returning to a discussion of injunctive relief, the court will briefly discuss other facets of the program it finds disturbing. Commissioner Coughlin testified that guidelines have not yet been formulated for the selection of inmates for placement in D-2. One inmate testified that he expected to be released in November of this year. Coupled with the testimony of Doctor Sharpe that some inmates with AIDS are treated only once every several months, it is readily apparent that this inmate or some other inmate might very well be placed in D-2 and have his diagnosis revealed, yet never receive treatment. Another inmate testified that he voluntarily took a blood test in February of this year, was informed that the results would be kept confidential, yet he found himself transferred to D-2. He testified that he is not receiving any treatment. It baffles this court as to *why* such an individual should be placed in D-2. It certainly does not baffle the court as to *how* it occurred when the Commissioner has testified that formal written guidelines have not yet been formulated for the selection of inmates.[19]

---

**19.** Assistant Commissioner Broaddus did testify that he has formulated such guidelines and that they were verbally communicated to personnel within the prison system. He also testified that these guidelines were not followed.

As currently funded and equipped, prisoners' constitutional rights are being violated by a program which offers very few of the benefits it is capable of providing. As commissioner Coughlin testified, the counselor for D–2 has not been selected or trained, nor have nurses been hired. Defendant Broaddus testified that the New York State Legislature has not yet appropriated funds for these positions. Similarly, the proposed clinic has not been established; at this point it is unclear what space, if any, will be provided for the treatment personnel at the prison, and it is equally uncertain as to how frequently the clinic's services will be made available.

Most important of all, however, is the fact that those benefits which are offered could be provided equally well, with no more than *de minimis* costs to the program's objectives, in a program designed to allow the prisoner to choose whether he wishes to be housed in D–2. The commissioner of corrections has indicated that inmates with AIDS effectively have this power. There is no acceptable reason why a prisoner must have his constitutional rights violated, particularly in an incomplete program, during the short period necessary to diagnose and counsel him.

In conclusion, the court finds that the plaintiff has established that he and others in the class are likely to suffer irreparable harm. Plaintiff has also established to the court's satisfaction that he is likely to prevail on the merits of this action, assuming no major changes in the program take place prior to a full hearing. Moreover, the court also believes that, given the various areas of concern identified by the court, there are serious questions going to the merits as to make them a fair ground for litigation. Again barring any major changes prior to a full hearing on the merits, the balance of hardships tips decidedly toward the movant.

Therefore, the court will grant the plaintiff's request for preliminary relief. The defendants are enjoined from making any further involuntary transfers of inmates who have tested positive for HIV to any separate dormitory set aside at the Greene Correctional Facility for such inmates.[20] This relief will remain in effect until such time as a full hearing can be held on the merits and a further decision is rendered by the court.

It is So Ordered.

20. This Memorandum–Decision & Order supersedes the court's Order of October 12, 1988.