_____

No. 95-2476
_____

Jeffrey Tokar,                      *
                                    *
            Appellant,              *
                                    *  Appeal from the United States
     v.                             *  District Court for the
                                    *  Western District of Missouri.
Bill Armontrout; Robert             *
Drennen; Myrna E. Trickey,          *
                                    *
            Appellees.              *


_____

                Submitted:  April 8, 1996

                  Filed:  October 8, 1996
                    _____

Before MAGILL, Circuit Judge, HENLEY, Senior Circuit Judge, and LOKEN,
     Circuit Judge.

                        _____

HENLEY, Senior Circuit Judge.


     Jeffrey Tokar appeals from a judgment of the district court[1] granting
summary judgment in favor of Bill Armontrout, Robert Drennen, and Myrna E.
Trickey, former officials with the Missouri Department of Corrections (the
department).  We affirm.


     Tokar is an HIV-positive individual.  From June 1989 to August 1989
and again from September 1991 to November 1991, he was an inmate at the
Jefferson City Correctional Center (JCCC) housed in

_____

     [1]The Honorable Scott O. Wright, United States District Judge
for the Western District of Missouri, adopting the Report and
Recommendation of The Honorable William A. Knox, United States
Magistrate Judge for the Western District of Missouri.

Unit Six, a segregated unit for HIV-positive inmates.[2]  Armontrout was warden of JCCC from January 2, 1984 to December 31, 1990; Drennen was the hospital administrator of JCCC from November 2, 1987 to August 31, 1989; and Trickey was the department's director of classification and treatment from October 15, 1988 to October 31, 1990.

In 1989, Tokar filed suit under 42 U.S.C. § 1983 against appellees, alleging that they had violated his right to equal protection by placing him in a segregated unit due to his HIV-positive status.  He also alleged that conditions of confinement in the unit violated his Eighth Amendment right to be free from cruel and unusual punishment.  The action was stayed for a number of years.  After the stay was lifted, in 1993 appellees filed a motion for summary judgment on qualified immunity grounds, asserting that they had not violated any clearly established right by segregating Tokar on the basis of his HIV-positive status as a health and safety measure. The district court granted the motion in part.  As to the status challenge, the court held that appellees were entitled to qualified immunity, citing Muhammad v. Carlson, 845 F.2d 175, 179 (8th Cir. 1988) (court "refus[ed] to find a [due process] liberty interest in procedures established for identifying, treating, and isolating prisoners carrying the AIDS virus"), cert. denied, 489 U.S. 1068 (1989).  However, the district court held that appellees were not entitled to qualified immunity on Tokar's conditions of confinement claims and allowed Tokar to restate his claims.

In an amended complaint, among other things Tokar alleged he

_____

[2]Tokar was an inmate in JCCC from June 15, 1989 to August 31, 1989, September 11, 1991 to January 16, 1992, and April 28, 1992 to September 7, 1993.  In November 1991, the department discontinued its policy of segregating HIV-positive inmates from the general population.  Tokar continued to live in Unit Six for some time after it was desegregated.

-2-

had been subjected to cruel and unusual punishment because the unit had broken windows, a leaky roof, and unsanitary and insufficient toilet and shower facilities. He also alleged numerous denial-of- access claims, including denial of medical care and counseling and access to the law library, gift and snack shop, church, recreational and exercise facilities, and educational and rehabilitation opportunities. Throughout his complaint, Tokar claimed that segregation in Unit Six violated his right to privacy by disclosing his HIV status to other inmates and guards. After appellees' motion to dismiss was denied, they filed a motion for summary judgment, asserting that Tokar failed to set forth facts demonstrating that the conditions deprived him of "the minimal civilized measure of life's necessities," quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981), that defendants had acted with deliberate indifference, citing Farmer v. Brennan, 114 S. Ct. 1970 (1994), or that he had been harmed by any condition or denial, see Lewis v. Casey, 116 S. Ct. 2174, 2179 (1996).

In support of their motion for summary judgment, appellees filed a copy of Tokar's December 1994 deposition. In the deposition, Tokar stated that windows were broken and the roof leaked in spots, but acknowledged that his cubicle did not have a window and the roof above it did not leak. He also admitted that after he notified a staff member that windows were broken, they were replaced, and before they were replaced he could use a blanket to stay warm. He also complained that there were only two toilets and showers for sixty inmates, but admitted that he could take a shower whenever he needed to and that the longest he had to wait to use a toilet was fifteen to thirty minutes. Although he claimed that the toilet facilities were filthy, Tokar could not say for how long a period of time the toilets remained filthy, acknowledging that inmates were assigned to clean them and that he had never asked for cleaning supplies because "it wasn't [his] job." In support of his denial of medical care claim, Tokar stated that he had to wait about three weeks to see a doctor about ear and back

"problems" and had not received a blood test he had requested.  As to his counseling claim, Tokar admitted that when he was diagnosed as HIV-positive in June 1983 at a department medical facility, a nurse spoke with him about his condition and informed him he could obtain more information about HIV at JCCC, but that he did not request information or request to see anyone until 1991, even though he knew that a doctor visited the unit once a week, a nurse came by on a regular basis, and a counselor was available.[3]  As to his denial-of-access claims, Tokar, among other things, admitted that he had access to an outdoor recreational yard several times a day, weight-lifting equipment, a television and a pool table.  Although he complained about a denial of access to the law library, Tokar admitted that he was able to file the instant suit in 1989 and could not state how he had been harmed in pursuing the action, noting that sometime in 1991 he saw a paralegal from whom he could request legal materials, and did not know if he had access to a paralegal before that time because he "wasn't concerned with the issue too much."

As to appellees' liability, Tokar conceded that prior to filing suit he had never spoken to appellees or filed grievances about his conditions of confinement.  He explained that he sought to hold Armontrout liable because "it was [his] responsibility to make sure everybody was treated fairly and just"; Trickey liable because she "failed to competently perform her job"; and Drennen liable because he failed to train his staff in the "handling of HIV-positive inmates."

In opposition to appellees' motion, Tokar submitted several newspaper articles which discussed the problems of HIV in prisons across the country and a 1995 affidavit by Sister Ruth Heaney, a

---

[3]Appellees also filed copies of Tokar's medical records, including a 1989 form in which he acknowledged that he had "post-test counseling regarding the AIDS virus."

-4-

nun who visited and counseled inmates. Although the newspaper articles quote several Missouri prison officials, the officials discussed conditions in 1987 and none of the officials were appellees. In her affidavit, Sister Ruth stated that she had observed broken windows, mice and insects in Unit Six, but she did not indicate when she saw those conditions or that she had reported them to prison officials.

At an oral argument, the district court expressed several concerns about the case, including its concern that although Tokar had alleged that numerous conditions of confinement were inhumane, he had failed to produce evidence in support of his generalized allegations or how he had been harmed by any condition. Counsel told the court that Tokar's Eighth Amendment claim was not necessarily based on "a particular issue . . . but [wa]s based on all the conditions in general." Counsel also conceded that Tokar had not had "any adverse medical reaction" other than just "emotional." The district court granted appellees' motion, holding that there were no triable issues of fact.

Based on our de novo review, the district court did not err in granting appellees' motion for summary judgment. "As a general matter, a prison official commits an Eighth Amendment violation only when two requirements are met: (1) the deprivation alleged must be objectively, sufficiently serious, and (2) a prison official must be, as a subjective state of mind, deliberately indifferent to the prisoner's health or safety." Aswegan v. Henry, 49 F.3d 461, 464 (8th Cir. 1995) (internal quotations omitted). Although appellees had the initial burden of showing that there were no genuine issues of material fact and that they were entitled to judgment as a matter of law, once they supported their motion the burden shifted to Tokar to go beyond his pleadings and "by affidavits or . . . otherwise . . . set forth specific facts showing that there is a genuine dispute for trial." Fed. R. Civ. P. 56(e).

It is clear that "the record that [Tokar] developed did not satisfy that burden." Davis v. Fulton County, 90 F.3d 1346, 1353 (8th Cir. 1996). As to the objective components of his Eighth Amendment claims, we need not address each specific condition Tokar had alleged to be inhumane. Indeed, in the district court and on appeal Tokar appears to concede, as he should, that he failed to produce evidence showing that any one condition was inhumane.[4] Instead, he argues that his "overall" conditions were inhumane. However, the Supreme Court has stated that "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual

---

[4]We note that "[c]onditions, such as a filthy cell, may be tolerable for a few days and intolerably cruel for weeks or months." Whitnack v. Douglas County, 16 F.3d 954, 958 (8th Cir. 1994) (quoting Howard v. Adkison, 887 F.2d 134, 137 (8th Cir. 1989)). For example, in Howard this court found conditions inhumane where for two years a prisoner was "placed in a cell covered with filth and human waste[,] . . . requests for remedial measures went unheeded, and he was denied access to proper cleaning supplies." 887 F.2d at 137. We also note that "[w]hile the length of time a prisoner must endure an unsanitary cell is undoubtedly one factor in the constitutional calculus, the degree of filth endured is surely another." Whitnack, 16 F.3d at 958. In other words, "the length of time required before a constitutional violation is made out decreases as the level of filthiness endured increases." Id. For example, in Fruit v. Norris, 905 F.2d 1147, 1151 (8th Cir. 1990), this court indicated that requiring inmates to work for even ten minutes in a well where they faced "a shower of human excrement without protective clothing and equipment would be inconsistent with any standard of decency." In Estelle v. Gamble, 429 U.S. 97, 102 (1976) (internal quotation omitted), the Supreme Court made clear that the standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society" and not, as appellees suggest in their brief, the standards in effect during the time of the drafters of the Eighth Amendment.

In contrast, here, Tokar could not say how long the toilets were "filthy." Also importantly, he admitted that he never asked for cleaning supplies. In Whitnack, this court accepted that unsanitary toilet conditions were "deplorable," but nonetheless held that the inmates had failed to prove the objective component of their Eighth Amendment claim, noting that requests for use of alternative facilities had not been denied and that within a couple of hours after the inmates had requested cleaning supplies, "they had been furnished with a spray cleaner . . . which could have been used to clean the toilet seat and sink bowl." 16 F.3d at 958.

punishment when no specific deprivation of a single human need exists."
Wilson v. Seiter, 501 U.S. 294, 305 (1991).  Although

> [s]ome conditions of confinement may establish an Eighth
> Amendment violation 'in combination' when each would not do so
> alone, [they do so] only when they have a mutually enforcing
> effect that produces the deprivation of a single, identifiable
> human need such as food, warmth, or exercise--for example, a
> low cell temperature at night combined with a failure to issue
> blankets.

Id. at 304.  Although it is conceivable that under certain conditions a combination of broken windows and a leaky roof in a cell could deprive an inmate of warmth,[5] in this case Tokar did not make such a showing.  Tokar admitted that his cubicle did not have a window, that the roof above it did not leak, and that before broken windows were repaired he could use a blanket to stay warm.

Moreover, even if Tokar had put forth evidence to create a triable issue of fact as to the objective components of his Eighth Amendment claims, he failed to set forth any evidence to create a triable issue concerning the subjective components of his claims.  Tokar admits that the doctrine of respondeat superior is unavailable to impose liability on appellees, see White v. Holmes, 21 F.3d 277, 280 (8th Cir. 1994), but asserts they are liable based on their alleged failure to train or supervise their employees.  However, this court has stated that an inmate's section 1983 "cause of action predicated on a supervisor's failure to supervise or control his subordinates may be maintained only if a defendant

---

[5]Conversely, we note that the combination of sealed windows, inadequate ventilation, and crowded cells has been found to be unconstitutional because the combination caused the cells to "become like 'ovens.'"  Hamilton v. Love, 328 F. Supp. 1182, 1190 (E.D. Ark. 1971).  See also Fruit, 905 F.2d at 1151 (combination of working in "shower of human excrement without protective clothing and equipment" inhumane); cf. Good v. Olk-Long, 71 F.3d 314, 316 (8th Cir. 1995) (distinguishing Fruit because inmates were given protective eyewear, gloves, and boots while cleaning sewage back-up).

demonstrated deliberate indifference or [] authorization of the offensive acts."   Id. (internal quotation omitted).   Under the deliberate indifference standard, "a prison official cannot be found deliberately indifferent under the Eighth Amendment, 'unless the official knows of and disregards an excessive risk to inmate health or safety.'"  Prater v. Dahm, 89 F.3d 538, 541 (8th Cir. 1996) (quoting Farmer, 114 S. Ct. at 1970).  "In other words, . . . 'the official must both be aware of facts from which an inference could be drawn that substantial risk of harm exists, and he must also draw the inference.'"  Id. (quoting Farmer, 114 S. Ct. at 1982-83). See also Jensen v. Clarke, No. 95-1105, 1996 WL 498960 at *6 (8th Cir. Sept. 5, 1996).[6]

Although Farmer requires a showing of actual knowledge, in Farmer the Court made clear that an inmate's "failure to give advance notice is not dispositive" of the issue and that an inmate need not prove actual knowledge by direct evidence.  114 S. Ct. at 1984.  Instead, the Court stated that "[w]hether a prison official had the requisite knowledge of a substantial risk [of harm] is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence."  Id. at 1981.  For example, the Court explained that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious" or was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to the information concerning the risk

---

[6]In Farmer the Supreme Court rejected application of the objective deliberate indifference test set forth in Canton v. Harris, 489 U.S. 378, 396 (1989), which allowed municipal liability based on a failure to train if policy makers "were on actual or constructive notice of the need to train."  114 S. Ct. at 1981. The Court explained that the objective standard was "not an appropriate test for determining the liability of prison officials under the Eighth Amendment" because the amendment "ensure[s] that only inflictions of punishment carry liability."  Id.

and thus must have known about it."  Id. (internal quotation omitted).  In this case, although Tokar's failure to complain or file a grievance about any condition is not dispositive of the question whether appellees had actual knowledge, Tokar also failed to offer any circumstantial evidence from which a trier of fact could infer the officials had the requisite knowledge.  See Prater, 89 F.3d at 541-42.

Also, we agree with appellees that as to many of Tokar's claims, especially his denial-of-access claims, summary judgment, or even a Fed. R. Civ. P 12(b)(6) dismissal, was appropriate because either Tokar failed to allege a constitutional claim or failed to allege or demonstrate sufficient harm.  We believe it is unnecessary to set forth the deficiencies in Tokar's showings of harm as to each claim or set forth the allegations which fail to state a claim.  However, we note that we know of no constitutional right of access to a prison gift or snack shop.  We also note that Tokar had alleged that he had been denied physical access to the law library.  However, recently the Supreme Court has made clear that an inmate does not have a constitutional right to "turn[] pages in a law library."  Lewis v. Casey, 116 S. Ct. at 2182.  In Lewis, the Court clarified that although in Bounds v. Smith, 430 U.S. 817, 828 (1977), it had held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law[,]" the case did not establish a right of access to a law library or to legal assistance, but only "acknowledged [] the (already well-established) right of access to the courts."  116 S. Ct. at 2179.[7]

---

[7]In addition, in Lewis the Court held that in an access-to-courts claim to establish an actual injury an inmate has to show an impairment of his ability to "attack [his] sentence[], directly or collaterally, [or] . . . challenge the conditions of [his] confinement."  116 S. Ct. at 2182.  Even assuming that Tokar was alleging an access-to-courts claim, we do not believe he set forth facts demonstrating an actual injury.
In light of Lewis, we note that dicta in Hamm v. Groose, 15 F.3d 110, 112 (8th Cir. 1993), indicating that if an inmate were denied complete access to the law library, he need not prove actual injury, may be incorrect.  See Lewis, 116 S. Ct. at 2181 n.4.

Last, we address Tokar's argument that appellees violated his constitutional right to privacy by segregating him in Unit Six because the fact of segregation disclosed his HIV-positive status to other inmates and correctional officers. The district court held that appellees were entitled to qualified immunity on this issue, concluding that during the times in 1989 and 1991 that Tokar was segregated in Unit Six he had no clearly established constitutional right to non-disclosure of HIV status. We agree.

In Anderson v. Romero, 72 F.3d 518 (7th Cir. 1995), the Seventh Circuit recently held that prison guards were entitled to qualified immunity on an inmate's claim that they had violated his constitutional right to privacy by disclosing his HIV-positive status to other guards and inmates. After the court surveyed "the history of the legal concept of privacy," id. at 521, it held that "[n]either in 1992 nor today was (is) the law clearly established that a prison cannot without violating the constitutional rights of its HIV-positive inmates reveal their condition to other inmates and to guards in order to enable those other inmates and guards to protect themselves from infection." Id. at 524. For the reasons set forth in Anderson, we agree. We note that the court could not find a Supreme Court case or "appellate holding that prisoners have a constitutional right to confidentiality of their medical records." Id. at 523.[8] The "closest" appellate case the court

---

[8]In Anderson the court noted that in Hudson v. Palmer, 468 U.S. 517 (1984), the Supreme Court had held that prisoners had no Fourth Amendment right to privacy, but believed it was "premature to assume that the Court meant to extinguish claims of privacy of an entirely different kind." 72 F.3d at 522. The Seventh Circuit also believed that even if no privacy rights existed, certain actions of prison officials in disclosing HIV status, such as branding or tattooing HIV-positive inmates, might constitute cruel and unusual punishment under the Eighth Amendment. Id. at 523.

-10-

found was the Eleventh Circuit's decision in <u>Harris v. Thigpen</u>, 941 F.2d 1495 (11th Cir. 1991).  In <u>Harris</u>, HIV-positive inmates challenged a prison's policy of segregating them from the general population and, as does Tokar, argued that "the involuntary disclosure of inmates' [HIV-positive] status resulting from such segregation . . . violat[ed] constitutionally-guaranteed privacy rights."  <u>Id.</u> at 1512.  The Eleventh Circuit noted that the privacy right asserted in the case was "rather ill-defined," but for purposes of the opinion the court assumed a privacy right existed.  <u>Id.</u> at 1513.  However, the court held that the segregation policy was "a reasonable infringement [of the right] in light of the inmate interest at stake . . . and the difficult decisions that the [prison officials] must make in determining how best to treat and control within [the] correctional facilities the spread of a communicable, incurable, always fatal disease."  <u>Id.</u> at 1521 (footnote omitted).  <u>See also</u> <u>Anderson</u>, 72 F.3d at 524 ("even if a right of prisoners to the confidentiality of their medical records in general had been clearly established in 1992, it would not follow that a prisoner had the right to conceal his HIV status"); <u>cf.</u> <u>Moore v. Mabus</u>, 976 F.2d 268, 271 (5th Cir. 1992) ("identification and segregation of HIV-positive inmates obviously serves a legitimate penological interest"), <u>Muhammad</u>, 845 F.2d at 179 (in context of rejecting due process liberty interest claim court expressed "reluctance to hinder prison officials' attempts to cope with the extraordinarily difficult problems AIDS poses in a prison setting").[9]

---

[9]We note that in <u>Robbins v. Clarke</u>, 946 F.2d 1331, 1333 (8th Cir. 1991), in the context of rejecting an inmate's claim that prison officials had illegally conspired to conceal the identities of HIV-positive inmates, this court held that "prison officials who decline to reveal to the general population the identities of HIV-positive prisoners do not by so declining commit an illegal act." In the opinion, we cited <u>Doe v. Coughlin</u>, 697 F. Supp. 1234, 1240-43 (N.D. N.Y. 1988), in which the court had held that segregation of HIV-positive inmates violated their privacy rights.  By citing to <u>Doe</u>, we did not hold that an inmate had a clearly established constitutional right to privacy.  In any event, "district court decisions cannot <u>clearly</u> establish a constitutional right." <u>Anderson</u>, 72 F.3d at 525.

In conclusion, we hold that the district court did not err in granting appellees' motion for summary judgment. We do so simply because Tokar either failed to allege constitutional violations or set forth evidence sufficient to create triable issues of fact. On another record, the result could have been different.

Accordingly, the judgment of the district court is affirmed.

A true copy.

    Attest:

        CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.