United States Court of Appeals
Fifth Circuit

**F I L E D**

**June 28, 2004**

Charles R. Fulbruge III
Clerk

REVISED JULY 9, 2004

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 03-60529

_____

NAZARETH GATES, etc., ET AL

Plaintiffs

versus

THOMAS D. COOK, etc., ET AL

Defendants

_____

WILLIE RUSSELL, Etc., ET AL

Plaintiffs

WILLIE RUSSELL, on his own behalf and on behalf of those
similarly situated; SHERWOOD BROWN, on his own behalf and on
behalf of those similarly situated; KEVIN JORDAN, on his own
behalf and on behalf of those similarly situated; JOHN NIXON, on
his own behalf and on behalf of those similarly situated; PAUL
WOODWARD, on his own behalf and on behalf of those similarly
situated

Plaintiffs-Appellees

versus

ROBERT L. JOHNSON, COMMISSIONER, MISSISSIPPI DEPARTMENT OF
CORRECTIONS, in his official capacity; CHRISTOPHER EPPS, Deputy
Commissioner, Mississippi Department of Corrections, in his
official capacity; EMMITT L. SPARKMAN, Superintendent,
Mississippi State Penitentiary, in his official capacity; JESSIE
STREETER, Warden, Area IV, Mississippi State Penitentiary, in his
official capacity; LARRY D. HARRIS, Captain, Unit Administrator,
Unit 32, Mississippi State Penitentiary, in his official capacity

Defendants-Appellants

_____

Appeal from the United States District Court for

the Northern District of Mississippi, Eastern Division

_____

1

Before DEMOSS, DENNIS, and PRADO, Circuit Judges.

DENNIS, Circuit Judge:

Willie Russell ("Russell") brought suit in the Northern District of Mississippi against officials of the Mississippi Department of Corrections ("MDOC") on behalf of himself and other prisoners confined to Death Row, or Unit 32-C, in the Mississippi State Penitentiary in Parchman, Mississippi. Russell alleges that certain conditions of confinement on Death Row violate the Eighth Amendment's prohibition against cruel and unusual punishment. By consent of the parties, the case was tried to the magistrate judge, who found several Eighth Amendment violations and entered injunctions designed to alleviate those conditions. MDOC appealed.[1] We affirm in part and vacate in part.[2]

---

[1] Russell filed a motion to dismiss the appeal, arguing that this court was without jurisdiction because the order from which MDOC appeals was inherently tentative. We disagree. In addition to having jurisdiction to review final decisions of district courts, 28 U.S.C. § 1291, this court has jurisdiction to review interlocutory decisions "granting, continuing, modifying, refusing or dissolving injunctions." 28 U.S.C. § 1292(a)(1). The order from which MDOC appeals is the "Final Judgment" issued on May 21, 2003. That order imposes ten detailed injunctive requirements on MDOC. As Russell points out, the order also requires MDOC to report its "progress in meeting the remedial actions" on July 7. The requirement of a progress report does not change the fact that the May 21st order grants injunctions against Mississippi requiring immediate action. In fact, this court granted MDOC a stay of this injunctive order to relieve MDOC from the burden of compliance pending appeal. In short, the May 21st order qualifies as an order granting an injunction; thus, this court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), and Russell's motion to dismiss for lack of

2

## BACKGROUND

Russell argues that the prisoners housed on Death Row are knowingly and deliberately subjected to profound isolation, lack of exercise, stench and filth, malfunctioning plumbing, high temperatures, uncontrolled mosquito and insect infestations, a lack of sufficient mental health care, and exposure to psychotic inmates in adjoining cells. On May 21, 2003, the trial court issued a "Memorandum Opinion" containing its findings of fact and conclusions of law in which the court found that a number of the conditions alleged by Russell violated the Eighth Amendment's prohibition against cruel and unusual punishment. That same day, the court also issued a "Final Judgment" in which it mandated that MDOC comply with injunctive relief designed to alleviate those conditions. MDOC timely appealed. The trial court denied MDOC's motion for a stay pending appeal. MDOC then filed a motion for stay pending appeal with this court; we granted MDOC's motion.

## ANALYSIS

**Should this case be dismissed because it was not brought in accordance with the *Gates v. Collier* class action framework?**

jurisdiction is denied.

[2] As mentioned in Footnote 1, this court previously granted MDOC's motion for a stay of the injunctive relief pending appeal. On March 31, 2004, Russell filed a motion to lift that stay. Due to the filing of this opinion, the stay pending appeal is vacated and Russell's motion to lift the stay is denied as moot.

MDOC first argues that this case should have been brought under the framework for enforcing injunctive relief on the Mississippi prison system provided by *Gates v. Collier*, 501 F.2d 1291 (5th Cir 1974). MDOC bases this argument on this court's decision in *Gillespie v. Crawford*, 858 F.2d 1101 (5th Cir 1998). The plaintiff in *Gillespie* attempted to bring suit in federal district court challenging prison conditions in Texas state prison. At that time, a separate district court still retained jurisdiction over *Ruiz v. Estelle*, 503 F. Supp. 1265 (S.D. Tex. 1980), a class action that successfully challenged unconstitutional Texas prison conditions, to monitor the prison system until the injunctions issued in *Ruiz* had been met. *See Gillespie*, 858 F.2d at 1102. The *Gillespie* court stated:

> Separate individual suits may not be maintained for equitable relief from allegedly unconstitutional Texas prison conditions. To allow individual suits would interfere with the orderly administration of the class action and risk inconsistent adjudications. Individual members of the class and other prisoners may assert any equitable or declaratory claims they have, but they must do so by urging further action through the class representative and attorney, including contempt proceedings, or by intervention in the class action.

*Id*. at 1103.

*Gates* involved alleged constitutional deficiencies in the Mississippi prison system, and in 1998, after twenty-five years of oversight, the District Court for the Northern District of

4

Mississippi finally dismissed the action from its inactive docket as to state-owned, state-operated, and private-company-contracted facilities (not as to county facilities), complimenting the state on its compliance with prior orders. No. GC-71-6. The court stated:

> This dismissal shall be without prejudice for the plaintiffs, through counsel, to petition the Court to reopen the case or a portion thereof in order to enforce, amend, or seek additional injunctive relief. … This dismissal shall not apply to any order of the court with respect to the payment of attorneys fees and costs/expenses to plaintiffs' counsel, who shall, post-dismissal, continue to monitor compliance in state-owned, state-operated, and private-company-contracted facilities…. [T]he court finds and concludes that the rule of [*Gillespie*] will continue to apply in this case with respect to prisoners in state-owned, state-operated, and private-company-contracted facilities, and the court will continue to forward such prisoner petitions to plaintiffs' class counsel.

No. GC-71-6. Thus, in writing this dismissal order for *Gates*, the court apparently assumed that *Gates* was the sole vehicle for future prisoner complaints. Although Russell argues that the court only intended *Gates* as an option for seeking future equitable relief, the court's invoking the rule of *Gillespie* indicates that it was meant to be the sole vehicle.

But it does not appear that the reasoning of *Gillespie* is applicable here. The *Gillespie* court justified its rule as follows:

5

> Permitting multiple courts to entertain equitable claims and issue decrees that might affect the Texas prison system would require other courts to become familiar with the *Ruiz* decree, the current problems of the Texas prison system, and the possible disruptive effect of the exercise of equitable powers over matters covered by the *Ruiz* decree. Moreover, if separate suits for equitable relief are filed in other districts than that in which *Ruiz* is pending, even with respect to problems not encompassed by the relief granted in *Ruiz*, the court's orders may hobble the effect of the *Ruiz* court's continuing decree over the Texas prison system and its power both to enforce and to modify that decree.

*Id*. at 1103. As this passage illustrates, the *Gillespie* court was concerned with avoiding the inefficiency of a situation in which multiple courts would be forced to familiarize themselves with the problems of the Texas prison system. Similarly, the court was concerned with the increased confusion and decreased effectiveness that would likely arise if multiple district courts were simultaneously exercising equitable powers over the state prison system.

In the present case, the district court judge who was the author of the *Gates* dismissal order assigned this case to this magistrate judge in light of this magistrate's previous experience with *Gates*. Thus, we are not here faced with either the problem of a new district court being forced to get up to speed on the factually-intensive problems of the state prison system or with the problem of multiple district courts simultaneously exercising

6

equitable powers over the prison system. Additionally, the magistrate judge purported to consolidate this case with *Gates* after certifying the death row inmates as a subclass of *Gates*. MDOC argues that this is not sufficient, citing cases stating that "consolidation does not merge [multiple] suits into a single cause." *See, e.g.,Johnson v. Manhattan R. Co.*, 289 U.S. 479 (1933). Nevertheless, because of the consolidation and because the same judge has jurisdiction over the present action and *Gates*, the problems addressed by the *Gillespie* court are not present here.

MDOC points out that the *Gates* class counsel and class representative are not being utilized. But MDOC does not articulate what difference that makes, and we find it to be of no import. In fact, this court has already recognized that it may be proper for different counsel to represent a *Gates* subclass. *See Gates v. Cook*, 234 F.3d 221, 227-30 (5th Cir 2000) (reversing the district court's denial of a motion for substitution of counsel by a *Gates* subclass comprised of HIV-positive prisoners in the Mississippi prison system). Because this case was dealt with by the same court and judge who dealt with *Gates* and was consolidated with *Gates*, the concerns behind *Gillespie* are not present here and there is thus not any reason to dismiss this case.

**Should this case have been dismissed because of the class members' alleged failure to exhaust administrative remedies?**

7

MDOC argues that the judgment should be vacated and the case dismissed because the trial court did not require all of the inmates who are members of the present class to exhaust their administrative remedies. The plaintiffs respond that the named plaintiff, Russell, did exhaust his administrative remedies, and that no more is required. MDOC disputes the plaintiffs' contention that Russell exhausted his administrative remedies.

The Prison Litigation Reform Act ("PLRA") mandates that "[n]o action shall be brought with respect to prison conditions ... by a prisoner ... until such administrative remedies as are available are exhausted." 42 U.S.C.A. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). The Court made clear that exhaustion is now mandatory. *Id.* at 524. This court has held that the available administrative remedy must be pursued to its conclusion. *Wright v. Hollingsworth*, 260 F.3d 357 (5th Cir 2001). Thus, if the plaintiffs did not exhaust administrative remedies, this suit should be dismissed.

The trial court found that Russell was the only class member who had completed the MDOC Administrative Remedy Program ("ARP"). If true, this is enough to satisfy the requirement for the class. *See, e.g., Oatis v. Crown Zellerbach Corp.*, 398 F.2d 496, 498-99 (5th Cir. 1968) (exhaustion of remedies requirement satisfied for

8

class action if named plaintiff representing class exhausted remedies); 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d § 1776 (2d ed. 1986) ("[W]hen prospective relief is the primary remedy being sought, a representative who has exhausted his administrative remedies may bring a class suit on behalf of those who have not done so."). Thus, if Russell completed the ARP, exhausting administrative remedies, this case was ripe for adjudication. Again, the trial court found that Russell had completed the ARP and that the record adequately reflected Russell's and his counsel's steps taken through the administrative remedy process. MDOC disagrees.

MDOC maintains that the ARP is a three-step process: 1) the inmate writes a letter[3] to the Superintendent/Deputy Commissioner in care of the Legal Claims Adjudicator that is referred to a respondent by the Legal Claims Adjudicator; 2) if dissatisfied, the inmate may request relief from the Superintendent/Deputy Commissioner; 3) if dissatisfied, the inmate may appeal to the Commissioner in care of the ARP Administrator. The Commissioner will notify the inmate of his final decision within forty days of receiving the appeal. If a request is rejected for technical reasons or matters of form, the inmate is given five days from the date of rejection to file a corrected grievance. The ARP also

---

[3] The ARP rules indicate that the letter should state that it is a request for an administrative remedy and should present as many facts as possible.

provides that "[n]o more than ninety (90) days from initiation to completion of the process shall elapse, unless an extension has been granted" and that "expiration of response time limits without receipt of a written response shall entitle the offender to move on to the next step in the process."[4]

The ARP rules also provide that an inmate may make a request for emergency review by sending an emergency request to the Legal Adjudicator "to determine to what level the grievance must be forwarded if substantive actions must occur. The request shall be handled as expeditiously as possible, and shall be reviewed at the Commissioner's level by the Commissioner or his designee." The emergency review procedures further provide that, if the grievance is ruled not to be an emergency, it "may be resubmitted as a regular grievance" and that "[a]buse of the emergency review process ... shall be treated as a frivolous or malicious request." The emergency review procedure thus expedites the review process in certain situations so that the request can be dealt with

---

[4] Although no part of the ARP rules provide for a certificate of completion, MDOC asserts that the inmate receives a certificate of completion upon finishing the ARP. Under the prior version of section 1997e, before its amendment in 1996, the administrative remedy was required to be certified. 42 U.S.C. § 1997e(a)(2)(1994)(amended 1996). The 1994 district court order certifying the ARP under the prior version of the statute required inmates to complete the procedure and to attach a certificate to that effect to their complaint.

expediently at the Commissioner's level.[5]  The ARP does not provide

a definitive end for the emergency review procedure, but, as the

emergency review procedure facilitates quicker review at the

Commissioner's level, it follows that the requirement that the

Commissioner provide a written answer within forty days of

receiving the complaint likewise applies to the emergency review

procedure.

Russell maintains that he exhausted his administrative

remedies by utilizing the emergency review process.  On January 31,

2002, Russell's counsel delivered to MDOC Commissioner Johnson a

document titled "Emergency Request by Inmate Willie C. Russell for

---

[5] MDOC argues that the emergency request procedure only
provides a mechanism for temporary relief and does not excuse an
inmate from pursuing relief through the three-step ARP process.
Thus, MDOC maintains that Russell did not exhaust administrative
remedies because, in addition to utilizing the emergency relief
process, he did not complete the three-step process culminating
in a certificate of completion.
    But MDOC's contention is simply not supported by the
language of the policy outlining the ARP process.  The portion of
that policy detailing the procedure for emergency relief requests
does not indicate that the inmate must simultaneously proceed
through the three-step process.  In fact, it refers to the
regular grievance process only as an alternative when an
emergency request has been deemed to be a non-emergency.  MDOC
never rejected the emergency request nor advised Russell to
resubmit it as a regular grievance.  The policy does not indicate
that the emergency request procedure is simply designed to
provide stop-gap measures while the request proceeds through the
normal administrative procedures.  The most natural reading of
the policy leads to the conclusion that the emergency request
procedure simply expedites the administrative process by allowing
the request to be reviewed at the Commissioner's level without
having to proceed through the entire three-step process in
limited circumstances.

an Administrative Remedy Concerning Conditions on Death Row," complaining of the conditions at issue here and requesting a meeting to discuss these problems in an effort to avoid litigation.[6] On March 8, before a March 12 meeting with Commissioner Johnson, Russell's counsel sent the Commissioner a memorandum, outlining the complained of conditions on Death Row in greater detail.

On April 1, Russell's counsel sent a third letter to Commissioner Johnson referencing the original emergency request for an administrative remedy. This letter noted that Commissioner Johnson had agreed to remedy such conditions, if they existed, at the March 12 meeting. It further asked MDOC to respond by May 1 so as to inform Russell whether it would be able to make the necessary repairs by June 1. On April 15, Johnson sent a letter to Russell's counsel asserting that Russell's concerns regarding ventilation (heat) had been addressed by simply drilling some holes in the metal sheet on his cell door and that the concerns regarding

---

[6] Although the form was submitted directly to Commissioner Johnson instead of being sent through the Legal Adjudicator, MDOC never rejected the request for technical reasons or for matters of form. To the contrary, as discussed below, MDOC addressed the substance of Russell's request, albeit with some delay. As MDOC ignored this technical defect but instead addressed Russell's request at the administrative level and denied it for matters of substance, it cannot now claim that Russell failed to exhaust based on this technical defect. *Cf. Wendell v. Asher*, 162 F.3d 887, 890 (5th Cir. 1998) (stating that the exhaustion requirement imposed by the PLRA is subject to the defenses of waiver and estoppel).

sanitation and pest control were unwarranted. On June 14, Russell's counsel sent Johnson a final letter reiterating Russell's complaints and disputing Johnson's April 15th denial of the accuracy of the inmates' claims; Commissioner Johnson never responded. Throughout these negotiations, MDOC never rejected the emergency request on technical grounds or for matters of form nor advised Russell to resubmit it as a regular grievance. On the contrary, MDOC addressed Russell's core concerns by simply disagreeing with Russell's characterization of the conditions on Death Row.

We agree with the trial court that Russell concluded the ARP and thus exhausted administrative remedies. Initially, MDOC failed to comply with ARP procedures by failing to deal with Russell's complaint within the time limits provided by the ARP. Over ninety days expired between the time that Russell initiated the process and the time he finally filed suit, and Commissioner Johnson did not provide a written response to Russell's complaint within the forty day period. Available administrative remedies are exhausted in compliance with the PLRA when the time limits for the prison's response set forth in the prison grievance procedures have expired. *Underwood v. Wilson*, 151 F.3d 292, 295 (5th Cir. 1998). Similarly, per the terms of the ARP, Commissioner Johnson's failure to provide a written response to Russell's complaint within the forty day period entitled Russell to "move on to the next step in the process." As review at the Commissioner's level constitutes the

13

final step in the process, Russell was then entitled to file suit. Finally, even if MDOC was allowed to unduly delay the administrative process in violation of the terms of the ARP by failing to provide an answer from Commissioner Johnson within the forty day period, the April 15th letter denied that relief was warranted, effecting a rejection of the claim. That letter thus terminated the administrative process, as evidenced by Commissioner Johnson's refusal to respond to any further communications regarding these complaints. We agree with trial court's conclusion that Russell completed the ARP by utilizing the procedure for emergency review. Thus, Russell, and by extension the plaintiffs, properly exhausted administrative remedies.

**Should the injunctions be vacated on the grounds that they are not justified by conditions constituting cruel and unusual punishment in violation of the Eighth Amendment?**

*The Eighth Amendment Standard*

MDOC argues that none of the provisions of the injunctive decree were warranted by conditions constituting Eighth Amendment violations. The Eighth Amendment dictates that cruel and unusual punishment shall not be inflicted, U.S. CONST. amend. VIII, and it is applicable to the States by reason of the Due Process Clause of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 675 (1962). The treatment a prisoner receives in prison and the

14

conditions under which he is confined are subject to scrutiny under the Eighth Amendment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993).

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Prison officials must provide humane conditions of confinement; they must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measure to ensure the safety of the inmates. *Id*. This circuit has worded the test as requiring extreme deprivation of any "minimal civilized measure of life's necessities." *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir 1998). Further, mental health needs are no less serious than physical needs. *Partridge v. Two Unknown Police Officers of City of Houston, Texas*, 791 F.2d 1182, 1187 (5th Cir. 1986). The Supreme Court has made clear that the standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society" and not the standards in effect during the time of the drafting of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 102, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976) (internal quotation omitted).

A prison official has violated the Eighth Amendment when he 1) shows a subjective deliberate indifference to 2) conditions posing a substantial risk of serious harm to the inmate. *Farmer*, 511 U.S. at 833-34. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to

15

demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.  *Id.* at 842.

Conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise -- for example, a low cell temperature at night combined with a failure to issue blankets.  *Wilson v. Seiter*, 501 U.S. 294, 304 (1991).  The Supreme Court has noted that "the length of confinement cannot be ignored.... A filthy, overcrowded cell ... might be tolerable for a few days and intolerably cruel for weeks or months."  *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978).  It is also important to note that the inmate need not show that death or serious illness has occurred.  *Helling*, 509 U.S. at 32 ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.").

*Standard of Review*

MDOC argues that many of the trial court's findings of fact were clearly erroneous.  In reviewing the factual findings, this court employs a "clearly erroneous" standard.  *Alberti v. Klevenhagen*, 790 F.2d 1220, 1224 (5th Cir 1986).  A finding is

16

clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Id.* Whether the official showed a deliberate indifference to the condition is a factual finding that is reviewed under a "clearly erroneous" standard. *Brice v. Virginia Beach Correctional Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995). Once the facts are established, the issue of whether the facts constitute a constitutional violation is a question of law to be reviewed *de novo*. *Alberti*, 790 F.2d at 1224. If a constitutional violation is found, we employ an abuse of discretion standard in reviewing the equitable remedy itself. *Swann v. Charlotte - Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15-16 (1971).

*The Trial Court's Factual Findings*

The trial court made the following findings of fact, *inter alia*, as to the conditions on Parchman's Death Row.

*Sanitation*

Inmates have been subjected to cells that were extremely filthy with chipped, peeling paint, dried fecal matter and food encrusted on the walls, ceilings, and bars, as well as water from flooded toilets and rain leaks. Inmates are routinely moved from cell to cell and are forced to clean their new cells that may have been left in horrendous sanitation by the prior occupants,

17

especially if the occupant were mentally ill.  Adequate cleaning supplies and equipment are not routinely made available for inmates to clean their cells.  These filthy conditions contribute to the infestation of pests and play a role in the mental well-being of inmates.  *Russell v. Johnson*, 2003 U.S. Dist. LEXIS 8576 at *4-5 (N.D. Miss.).

   *Heating and Cooling*

The summer temperatures in the Mississippi Delta average in the nineties with high humidity, and Death Row is primarily not an air-conditioned facility.  There are industrial type fans in the hallways to help with air circulation, and most inmates have smaller fans.  Relief from the heat can be obtained by keeping the windows open in the cell using fans.  But keeping the windows open increases the mosquito population in the cells since there are holes in the cell window screens and the screen gauge is not sufficient to keep mosquitoes out.  The ambient temperature in the cells is within reasonable limits except during the summer months. The ventilation is inadequate to afford prisoners a minimal level of comfort during the summer months.  The probability of heat-related illness is extreme on Death Row, and is dramatically more so for mentally ill inmates who often do not take appropriate behavioral steps to deal with the heat.  Also, the medications often given to deal with various medical problems interfere with the body's ability to maintain a normal temperature.  The inmates

18

are not afforded extra showers, ice water, or fans if they don't have fans when the heat index is 90 or above. The heat problem extends to all of Death Row and possibly throughout Parchman. *Id.* at *5-7.

*Pest Control*

The heat problem also exacerbates the problem of pest control. Mosquitoes in Mississippi, and the Delta in particular, are a problem that cannot be eliminated. But the problem must be addressed and the impact lessened, especially with the incidence of West Nile virus, a mosquito-born disease increasing in Mississippi. Inadequate screening on the cell windows causes the inmates to choose between suffering from the heat or increasing the mosquitoes in their cells. The problems of heat and mosquitoes must be addressed to provide the inmates with conditions that would meet minimal constitutional standards. The problem of roaches and other vermin will be met by adhering to the ACA standards and by meeting the sanitation goals the court will set. *Id.* at *7.

*"Ping-Pong" Toilets and Plumbing*

Fecal and other matter flushed by a toilet in one cell will bubble up in the adjoining cell unless the toilets are flushed simultaneously. This has been a problem since the unit opened. Parchman officials have identified the problem as one of calibration, especially if the water is shut off. The toilets must be recalibrated to work properly. Recalibration has helped, but

19

not eliminated, the problem of ping-pong toilets. No one in civilized society should be forced to live under conditions that force exposure to another person's bodily wastes. The showers, water temperature, and quality of water are adequate. *Id.* at *7-8.

*Lighting*

The lighting in the cells is grossly inadequate. While 20 foot-candles[7] is the appropriate level of lighting for the cells, the maximum foot-candles measured by Russell's expert was seven or eight, with the typical cell being in the 2-4 foot-candle range. *Id.* at *9-10.

*Preventive Maintenance Program*

The preventive maintenance program instituted by MDOC appears to be adequate, although it should be in writing. *Id.* at *10.

*Laundry*

The inmates' laundry is returned foul-smelling, necessitating the inmates to wash their clothes in their cells. The inmates are entitled to laundry that is clean and not foul-smelling. *Id.*

*Mental Health Issues*

---

[7] A foot-candle is "[a] unit of measure of the intensity of light falling on a surface, equal to one lumens per square foot and originally defined with reference to a standardized candle burning at one foot from a given surface." THE AMERICAN HERITAGE COLLEGE DICTIONARY 530 (3rd ed. 1993).

At least six severely psychotic prisoners are housed on Death Row, and many more are diagnosed with quantifiable mental health problems. The extremely psychotic prisoners scream at night, throw feces, and generally make life miserable for the other inmates and guards. As stated by Dr. Kupers, a psychiatry professor and expert for Russell, "it boils down to warehousing people with severe mental illness ... some are medicated, but there is essentially no other mental health services." The mental health care afforded the inmates on Death Row is grossly inadequate. The isolation of Death Row, along with the inmates' pending sentences of death and the conditions on Death Row are enough to weaken even the strongest individual. What mental health services are provided generally take place at the inmate's cell within hearing of other inmates and guards. This results in the failure of inmates to tell the mental health specialists anything of substance. Moreover, comprehensive mental health evaluations are consistently inadequate. Inmates are also prescribed psychotropic drugs with only sporadic monitoring. This can result in life-threatening situations due to the toxicity of these drugs. Appropriate treatment of mentally ill inmates will in turn help address the issues of excessive noise and sanitation problems caused by severely psychotic inmates. *Id*. at *11-12.

*Exercise*

Proper exercise is advantageous for mental health and well-being. The exercise facilities provided are adequate. While, in

21

general, the use of "flip-flops" is understandable as a security measure, such shoes do not allow effective exercise. The inmates should be given access to sneakers prior to entering the exercise pen and should be given access to water and shade while exercising. *Id.* at 12.

*The Trial Court's Conclusions of Law*

The court concluded that the conditions identified in the court's findings of fact constituted Eighth Amendment violations because they posed a substantial risk of harm to the inmates' health and, based on the obvious nature of these risks, the prison officials showed a deliberate indifference to such harm.

*Injunctive Relief Entered by the Trial Court*

The court directed the following remedial actions.

> 1.  If defendants wish to continue the practice of moving inmates from cell to cell in Unit 32-C, they will insure that the cell to which an inmate is moved is clean prior to the move. While an inmate should be required to keep his own cell clean, he should not be required to clean the cell of another inmate in order to inhabit it.
>
> 2.  Adequate cleaning supplies and equipment shall be provided inmates in order that they may clean their cells at least weekly.
>
> 3.  A general preventive maintenance schedule and program shall be reduced to writing within 60 days of this order.

22

4. Defendants shall take the necessary measurements in the unit in order to determine the heat index on the individual tiers. These measurements shall be taken daily at 10:00 a.m., 1:00 p.m., 4:00 p.m., and 7:00 p.m. during the months of May through September and at 1:00 p.m. in all other months. If the heat index reaches 90 degrees or above, the defendants will insure that each cell is equipped with a fan, that ice water is available to each inmate, and that each inmate may take one shower during each day when the heat index is 90 degrees or above. As an alternative, the defendants may provide fans, ice water, and daily showers during the months of May through September. This remedy shall apply to all of Unit 32.

5. The defendants shall continue their efforts at mosquito eradication and pest control. The defendants shall also insure that all cell windows are repaired and screened with 18 gauge window screen or better. This remedy shall apply to all of Unit 32.

6. The defendants shall insure that the problem of "ping-pong" toilets in Unit 32 as a whole is addressed. The defendants shall provide to the court within 60 days the details of a plan to eradicate this problem. The court is not convinced that recalibration is sufficient, but will await the defendants' report on their plan.

7. The defendants shall also upgrade the lighting in Unit 32 as a whole to provide lighting in each cell equal to 20 foot-candles.

8. The defendants shall insure that the proper chemical agents are used at the laundry so that inmates' laundry is returned clean and without a foul smell.

9. The defendants shall insure that the new vendor for medical services complies with the ACA and the National Commission on Correctional Healthcare medical and mental health standards. Each inmate on Death Row shall be given a comprehensive mental

23

health examination in private. These comprehensive examinations shall be conducted on a yearly basis. Those inmates diagnosed with psychosis and severe mental health illnesses shall be housed separately and apart from all other inmates. The medication levels of all inmates receiving psycotropic medications shall be monitored and assessed in accordance with appropriate medical standards. All inmates receiving mental health counseling or evaluation shall meet with the mental health professionals in a private setting.

10. The inmates on Unit 32-C shall continue to receive the opportunity to exercise as currently available. However, the inmates shall be given the opportunity to wear sneakers while exercising if they prefer rather than "flip-flops." A shaded area for exercise shall be provided with access to water.

*Russell v. Johnson*, 2003 U.S. Dist. LEXIS 8573 at *1-4 (N.D. Miss.).[8]

---

[8] MDOC makes a cursory argument that the injunctions must be reversed because the trial court failed to make particularized findings required by the PLRA, 18 U.S.C. § 3626(a). There are multiple problems with this argument. The first is that MDOC never presented this argument to the trial court. This court does not generally review issues raised for the first time on appeal. *See, e.g., Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993). Additionally, MDOC cites *Castillo v. Cameron County*, 238 F.3d 339, 351 (5th Cir. 2001), for the proposition that a court must make particularized findings, on a provision-by-provision basis, that each injunction is narrowly drawn, goes no further than necessary to correct the violation, and is the least intrusive means of correcting the violation. But MDOC's reliance on *Castillo* is misplaced. *Castillo* requires such findings to be made when the district court holds that prior injunctive relief should not be terminated, relying on section 3262(b)(3). *Id.* at 351-54. Section 3262(b)(3) on its face requires such written findings. Conversely, section 3262(a)(1), which applies to prospective relief and is thus applicable here, does not.

24

**Is the injunctive relief entered by the trial court justified by conditions in violation of the Eighth Amendment's prohibition against cruel and unusual punishment?**

MDOC asserts that, as to several of the injunctions (Injunctions #2, #5, #6, #7, and #9), it is already meeting, intending to meet, or attempting to meet the standards enunciated by the trial court. Thus, MDOC argues, the injunctions are not required. But MDOC's assertions that it intends to meet these standards do not suffice to moot the issue. It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000) (citations omitted). If it did, the courts would be compelled to leave "the defendant . . . free to return to his old ways." *Id.* In accordance with this principle, the standard for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id*. The "heavy burden of persuading" the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness. *Id.* The trial court's citation to *Friends of the Earth* accompanied by its assertion that Russell's claims were not moot indicates that the

25

trial court was not persuaded. The fact that many of these conditions have persisted for years despite MDOC's purported efforts leads us to likewise conclude that MDOC has not met the heavy burden of showing that its voluntary conduct has mooted any of the issues presented here.

Similarly, MDOC also argues, as to several of the injunctions, that Parchman's accreditation by the American Correctional Association ("ACA") is proof that the conditions in question don't violate the Eighth Amendment. But it is absurd to suggest that the federal courts should subvert their judgment as to alleged Eighth Amendment violations to the ACA whenever it has relevant standards. Additionally, the ACA's limited inspections are not be binding as factual findings on the magistrate or on this court. While compliance with ACA standards may be a relevant consideration, it is not *per se* evidence of constitutionality. *See Ruiz v. Johnson*, 37 F. Supp. 2d 855 924-25 (S.D. Tex. 1999) (recognizing the limitations of ACA accreditation and noting situations where it has not equated to constitutionality), *rev'd on other grounds*, 178 F.3d 385.

MDOC finally argues that none of the injunctions are based on Eighth Amendment violations and, thus, that all of the injunctions must be reversed. Using the relevant Eighth Amendment standard, we will examine each of the injunctions in turn.

*Injunctions #1 and #2*

26

MDOC argues that the first injunction, which prohibits MDOC from requiring inmates to clean the cells into which they are transferred, cannot stand because there was no proof of any medical injury or illness resulting from this practice. MDOC similarly maintains that the second injunction, which requires that adequate cleaning supplies be provided to the inmates at least weekly, is unsupported by any evidence of medical illness arising from this situation or a showing of deliberate indifference by MDOC officials. MDOC also contends that cleaning supplies are regularly issued to inmates and that the cells were clean as of the date of trial.

This court has previously held that filthy cell conditions may constitute an Eighth Amendment violation. *See Harper v. Showers*, 174 F.3d 716, 720 (5th Cir 1999). Other circuits have made similar holdings; the Eighth Circuit has held that a prisoner being placed in a cell covered with filth and human waste for a two-year period without proper cleaning supplies constitutes cruel and unusual punishment. *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989) (recognizing that "inmates are entitled to reasonably adequate sanitation, personal hygiene, and laundry privileges, particularly over a lengthy course of time"); *see also McBride v. Deer*, 240 F.3d 1287, 1292 (10th Cir. 2001) (holding that three days in a feces-covered cell states a claim upon which relief could be granted).

Russell points to testimony adduced at the trial court indicating that the cells were "extremely filthy" with crusted fecal matter, urine, dried ejaculate, peeling and chipping paint, and old food particles on the walls. Living in such conditions would present a substantial risk of serious harm to the inmates, and we cannot say that trial court's decision to credit this testimony was clearly erroneous. Also, in light of substantial testimony indicating that such conditions were not atypical and were easily observed, we cannot say that the trial court's conclusion that MDOC officials showed a deliberate indifference to this risk is clearly erroneous. Further, the testimony was conflicting as to the frequency and quality of the provision of cleaning supplies, and we cannot say that the trial court's conclusion to credit testimony supporting the inadequacy of cleaning supplies was clearly erroneous. As living in such filthy conditions would present the inmates with a risk of serious harm to which MDOC officials have displayed a deliberate indifference, Injunctions #1 and #2 were justified by an Eighth Amendment violation. They are, therefore, affirmed.

*Injunction #3*

MDOC challenges the third injunction, which directs MDOC to reduce a general preventive maintenance schedule and program to writing. MDOC argues that there is no evidence supporting the elements required for a finding of cruel and unusual punishment

28

that would support this injunction. Russell responds that "[t]he risks of squalid conditions and the constantly recurring break-down of the water, plumbing, and other operating systems were obvious," and Russell's environmental health and safety expert testified that the same problems would continue to recur if MDOC did not put a written plan in place.

While federal courts can certainly enter injunctions to prevent Eighth Amendment violations, they are not to micromanage state prisons. *Bell v. Wolfish*, 411 U.S. 520, 562 (1979). The trial court entered injunctions to directly remedy each of the complained-of conditions that rise to the level of an Eighth Amendment violation. Russell has cited no case that supports the proposition that the trial court can further affect the internal operations of MDOC by requiring it to produce a writing preventive maintenance program to which it will adhere. The additional requirement of a written preventive maintenance program, while desirable, is not independently supported by additional conditions that constitute an Eighth Amendment violation, and it cannot stand. Thus, we vacate that injunction.

*Injunction #4*

The fourth injunction directs MDOC to provide fans, ice water, and daily showers when the heat index is 90 degrees or above, or alternatively to make such provisions during the months of May through September. The injunction also purports to apply to all of

Unit 32, as opposed to only Unit 32-C. Initially, it is important to note that the class represented by Russell consists entirely of Parchman's Death Row prisoners, who are housed in Unit 32-C. Thus, to the extent that the injunction purports to apply to parts of Unit 32 beyond Unit 32-C, it exceeds the scope of the litigation and is therefore invalid. *See Thomas v. County of Los Angeles*, 978 F.2d 504, 509-10 (9th Cir. 1992) (reversing an injunction as overbroad when it purported to apply to the entire Los Angeles County Sheriff's Department although the plaintiff's complaint and evidence only applied to one specific station).

MDOC contends that no Unit 32-C inmate has ever suffered any serious heat-related illness. But, as noted above, Russell does not need to show that death or serious illness has yet occurred to obtain relief. He must show that the conditions pose a substantial risk of harm to which MDOC officials have shown a deliberate indifference. Russell presented the court with expert testimony from Dr. Vassallo[9] that it was "very likely" that, under current conditions on Death Row, an inmate will die of heat stroke or some other heat-related illness. In fact, Dr. Vassallo's testimony indicated that Death Row prisoners had made many complaints of

---

[9] Dr. Vassallo is a faculty member of the Department of Surgery and Division of Emergency Medicine at New York University School of Medicine and is a medical toxicologist at the New York Regional Poison Control Center. She has lectured extensively on thermoregulation and hyperthermia (heat illness) and has authored the "Thermoregulatory Principles" chapter of Goldfrank's <u>Toxicologic Emergencies</u>, a textbook on medical toxicology.

symptoms commonly recognized to be related to heat-related illness and that those conditions had simply gone undiagnosed.

MDOC further cites language from *Woods v. Edwards*, 51 F.3d 577 (5th Cir. 1995), in which Woods, a prisoner at the Louisiana State Penitentiary at Angola, claimed, *inter alia*, that the conditions in extended lockdown were unconstitutional. Extended lockdown isolates inmates as punishment for disciplinary violations. One of Woods' claims was that the cell used in his extended lockdown was inadequately cooled and that the high temperature aggravated his sinus condition. *Id.* at 581. This court noted that Woods "failed to present medical evidence of any significance." *Id.* This court went on to state: "[w]hile the temperature in extended lockdown may be uncomfortable, that alone cannot support a finding that the plaintiff was subjected to cruel and unusual punishment in violation of the Eighth Amendment." *Id.* The *Woods* court found that Woods had not presented medical evidence sufficient to state an Eighth Amendment violation; *Woods* does not stand for the proposition that extreme heat can never constitute cruel and unusual punishment. Finally, MDOC points out that the Seventh Circuit has held that one shower a week is sufficient. *Davenport v. DeRobertis*, 844 F.2d 1310, 1316-17 (7th Cir. 1988). But *Davenport* is inapt, as it dealt only with cleanliness while the testimony upon which this injunction rests indicated that cold showers would help alleviate the risk of heat-related illness.

31

Based on the evidence presented, we cannot say that the trial court's finding that the probability of heat-related illness is extreme at Unit 32-C was clearly erroneous. Thus, this condition presents a substantial risk of serious harm to the inmates. Again, based on the open and obvious nature of these conditions and the evidence that inmates had complained of symptoms of heat-related illness, the trial court's finding regarding MDOC's deliberate indifference is not clearly erroneous. Thus, Injunction #4 was justified by an Eighth Amendment violation, and it is affirmed insofar as it applies to Unit 32-C.[10]

*Injunction #5*

The fifth injunction requires MDOC to continue its efforts at pest control and, more specifically, to ensure that all cell windows are repaired and screened with 18 gauge window screen or better. Injunction #5 purports to apply to all of Unit 32. Initially, like Injunction #4, to the extent that Injunction #5 purports to apply to parts of Unit 32 beyond Unit 32-C, it is invalid.

---

[10] In a footnote in its brief, MDOC asserts that the extra showers ordered by the trial court would cause a major prison security problem. Russell replies that no such evidence was presented at trial and, thus, that the trial court should be given the first opportunity to rule on this issue. In their reply brief, MDOC admits that such evidence was only presented to the court as part of MDOC's July 2003 progress report. But only the May 21, 2003, final order of the trial court is currently under review, not any subsequent monitoring of the trial court's injunctive relief. This issue is thus not before us.

32

MDOC first argues that there is no basis for a federal court to order MDOC to continue to do what it is already doing. But, as discussed above, the pest infestation problems persist, and MDOC has not met the burden of convincing the trial court or this court that its efforts at pest control have mooted this issue. MDOC also argues that the evidence shows that there were no holes in the screens at the time of trial. But the trial court was presented with testimony that there were cells with holes in the screens, and, in any event, the insufficient gauge on the screens would allow the infestation problem to continue even in absence of holes in the screens.

MDOC argues generally that Russell did not show either a substantial risk of harm to the inmates or deliberate indifference on the part of MDOC officials. But the trial court was presented with testimony that insects swarm in the inmates' food and beds and that the inmates often must choose between opening the window for relief from the heat or closing the window for protection from mosquitoes, as the gauge on the screens is too large to keep out the mosquitoes. It is important to recognize that this injunction is supported by the trial court's findings on heat, as the court noted that the mosquito infestation accompanied by the insufficient screen gauge exacerbated the heat problems by deterring the inmates from opening their windows to increase circulation. In addition to the risk of heat-related illness, the pest infestation problems

33

were linked to chronic sleep deprivation, which exacerbates the symptoms of mental illness. As Injunction #5, like Injunction #4, is supported by the constitutional violation stemming from the excessive heat, it is affirmed as to Unit 32-C.

*Injunction #6*

The sixth injunction requires MDOC to remedy the problem of "ping-pong" toilets. Like Injunctions #4 and #5, this injunction is invalid to the extent it purports to apply to parts of Unit 32 outside of Unit 32-C.

MDOC argues that there is no evidence of any serious medical problem stemming from the ping-pong toilets and, further, that in absence of objective evidence of such a problem there can be no finding of deliberate indifference on the part of MDOC officials. MDOC cites *Tokar v. Armontrout*, 97 F.3d 1078 (8th Cir. 1996), for the proposition that exposure to raw sewage is not cruel and unusual punishment where there has been no demonstration of an adverse medical reaction. But MDOC seriously misconstrues *Tokar*. Tokar complained generally that the prison toilets were "filthy" without specifying how long the toilets remained filthy and while acknowledging that he had not asked for cleaning supplies because cleaning the toilets was the job of other inmates. *Id.* at 1081. The facts of *Tokar* are quite different from the facts presented here, in which inmates have regularly been exposed to each others' feces for over a decade. In fact, the Eighth Circuit's

34

recognitions that exposure to waste may constitute cruel and unusual punishment and that the length of time a prisoner must endure unsanitary conditions is undoubtedly a factor in the constitutional calculus, *id.* at 1082 n.4, both weigh in Russell's favor. While evidence of a past medical injury would clearly strengthen Russell's case, Russell does not have to prove a past medical injury. He must prove a substantial risk of serious harm and MDOC officials' deliberate indifference to that harm.

Russell points to expert testimony stating that the situation presented when the feces of one inmate bubbles up in the neighboring cell, exacerbated when the toilets overflow, does constitute a serious health hazard. Russell also presented evidence to the trial court that the Mississippi State Department of Health warned MDOC every year for the past eleven years that the malfunctioning toilets in Unit 32-C are a critical public health problem requiring immediate attention. Additionally, Russell points to several circuit court cases indicating that "courts have been especially cautious about condoning conditions involving exposure to human waste." *Fruit v. Norris*, 905 F.2d 1147, 1151 (8th Cir. 1990); *see also, e.g., Despain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001)(exposure to human waste "evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment").

35

MDOC also asserts that there was substantial testimony regarding its attempts to correct the toilet problem, presumably arguing that this further rebuts a finding of deliberate indifference. As evidence of deliberate indifference, Russell points to the fact that the problems persist despite MDOC officials having been warned that the problem was urgent for more than a decade. Frequent exposure to the waste of other persons can certainly present health hazards that constitute a serious risk of substantial harm. Given the evidence presented to the trial court, we cannot say that the court's factual findings regarding the ping-pong toilets or the MDOC officials' deliberate indifference were clearly erroneous. Thus, this injunction, as applied to Unit 32-C, is affirmed.

*Injunction #7*

This injunction requires MDOC to upgrade the lighting in each cell to the level of twenty foot-candles. This injunction also purports to apply to Unit 32 as a whole and is invalid insofar as it purports to apply beyond Unit 32-C. MDOC argues that the injunction is wholly invalid because MDOC officials were in the process of upgrading cell lighting. As with the sanitation issues, the pest control issues, and the ping-pong toilets, MDOC's assertions that it is working on the problem are inadequate to moot the issue. MDOC also argues that there was no evidence of a substantial risk of serious harm stemming from the admittedly

36

inadequate lighting or of MDOC officials' deliberate indifference to such harm. But the trial court judge apparently credited expert testimony asserting that the lighting in the cells was grossly inadequate for the purposes of sanitation, personal hygiene, and reading, that this condition also contributes to further mental health deterioration, and that twenty foot-candles was the appropriate minimum level at which these activities could take place. Thus, this injunction is supported by the conditions supporting Injunctions #1, #2, and #9, discussed below, and it is affirmed.

*Injunction #8*

The eighth injunction requires MDOC to return the inmates' laundry clean and without a foul smell. MDOC argues that the prison laundry condition is not sufficiently serious to implicate the Eighth Amendment, citing *Green v. Ferrell*, 801 F.2d 765, 771 (5th Cir. 1986), and similarly that there was no proof of any serious medical harm to any inmate stemming from this condition. The *Green* court reiterated that "jails must provide 'reasonably adequate' sanitation" but overturned the district court's injunction requiring the jail to provide laundry services because the prisoners were provided with laundry detergent that they could use to wash their own clothes in the sink located in their cells. *Id.*

37

Russell points to testimonial evidence that, unlike the situation in *Green*, the Death Row inmates are not provided with detergent and in fact can be disciplined for doing their own laundry. First, the trial court found that the inmates do in fact wash their own clothes, as conceded by one of MDOC's witnesses, who testified that the inmates wash their own clothes because it is part of "prison culture." This finding was supported by substantial evidence and is incongruous with the proposition that inmates are disciplined for washing their own clothes. Given that the inmates do wash their own clothes, the only distinction between this case and *Green* is that the prisoners in *Green* were provided with laundry detergent while the Death Row inmates in this case wash their clothes with the bar soap. The difference between laundry detergent and bar soap is not sufficient to distinguish this case from *Green* and thus does not implicate the Eighth Amendment. Injunction #8 is therefore vacated.

*Injunction #9*

The ninth injunction outlines a number of requirements designed to alleviate some of the problems stemming from the allegedly inadequate mental health care afforded the inmates on Death Row. This injunction requires MDOC to comply with ACA and National Commission on Correctional Healthcare ("NCCH") standards regarding mental health, to give each inmate private, comprehensive mental health examinations on a yearly basis, to monitor and assess

38

the medication levels of inmates receiving psychotropic medications, and to house the inmates with psychosis and severe mental illnesses separately from the other inmates.

MDOC argues that it was already in compliance with ACA standards and, somewhat contradictorily, that MDOC has already begun the process of selecting a new medical vendor that would comply with ACA and NCCH standards. Once again, MDOC's assertion that it was already on the path towards compliance is insufficient to moot the issue. Further, the injunction does not require only ACA compliance. In any event, MDOC's assertion that it is already in compliance with ACA and NCCH standards is incongruous with the trial court's findings, including the statement that "the mental health care afforded the inmates on Death Row is grossly inadequate." These findings were based on substantial testimony adduced at trial and apparently credited by the trial court. For example, Russell produced evidence that the isolation and idleness of Death Row combined with the squalor, poor hygiene, temperature, and noise of extremely psychotic prisoners create an environment "toxic" to the prisoners' mental health. There was also evidence that the severely psychotic prisoners smear garbage and excrement in their cells, scream all night, and flood the tiers. This contributes to the problems of uncleanliness and sleep deprivation, and by extension mental health problems, for the other inmates. There was also testimony that prisoners seldom see medical staff

39

and that monitoring of medication was sporadic, with prisoners potentially being prescribed the wrong medication or no medication for long periods of time, potentially leading to extremely dangerous physical side effects or psychotic breakdowns.

MDOC also points out that two inmates have refused psychiatric medication so as to remain incompetent for execution. But this does not refute the trial court's findings that the mental health care afforded to inmates on Death Row is grossly inadequate. MDOC is only obligated to make adequate mental health care available for all Death Row inmates. The fact that some inmates may refuse to take advantage of such treatment so as to avoid execution is irrelevant to whether MDOC is meeting its obligation of complying with constitutional standards.

MDOC further argues that there was no demonstration of deliberate indifference to any serious mental or medical problem stemming from insufficient mental health care. In analyzing this argument, it is important to remember that mental health needs are no less serious than physical needs. *Partridge v. Two Unknown Police Officers of City of Houston, Texas*, 791 F.2d 1182, 1187 (5th Cir. 1986). This court has previously held that an inmate stated a nonfrivolous claim in complaining that he was placed in cells next to psychiatric patients who scream, beat on metal toilets, short out the power, flood the cells, throw feces, and light fires, resulting in his loss of sleep for days at a time. *Harper v.*

40

*Showers*, 174 F.3d 716, 720 (5th Cir. 1999). The trial court's findings indicate that the inmates are subjected to substantial risk of serious harm based on the mental health conditions on Death Row, and, based on the evidence presented to the trial court, we cannot conclude that the court's credibility determinations and factual findings are clearly erroneous. We agree that the conditions of inadequate mental health care, as found by the trial court, do present a risk of serious harm to the inmates mental and physical health. Again, the obvious and pervasive nature of these conditions supports the trial court's conclusion that MDOC officials displayed a deliberate indifference to these conditions. Thus, this injunction was justified by an Eighth Amendment violation and is affirmed.

*Injunction #10*

The tenth injunction requires MDOC to allow the inmates to wear sneakers instead of flip-flops while exercising and to provide the inmates with a shaded area for exercise and access to water. MDOC argues that this is impermissible micromanagement of state prison operations and that no evidence was presented establishing a constitutional violation. The evidence shows that inmates are allowed an hour of exercise four or five days a week. The evidence also shows that shoes and boots were replaced with flip flops because the inmates used the boots and shoes to kick other inmates and to throw at MDOC staff, and because the flip flops make escape

41

more difficult.  In fact, the trial court stated that it understood "the use of 'flip-flops' as general footwear as a security measure."

Russell argues that the flip-flops make it difficult or impossible to exercise vigorously.  But there is no support for the proposition that exercising in flip-flops constitutes cruel and unusual punishment.  Nor is there any support for the proposition that an hour of outdoor exercise without water or shade constitutes cruel and unusual punishment.  While exercise is certainly beneficial to physical and mental health, we find that the provisions for exercise made by MDOC are appropriate and that the tenth injunction is not justified by conditions in violation of the Eighth Amendment.  Thus, the tenth injunction is vacated.

## CONCLUSION

Injunctions #3, 8, and 10 are vacated in their entirety. Injunctions #4, 5, 6, and 7 are vacated to the extent they purport to apply to portions of Unit 32 beyond Unit 32-C.  The remainder of the injunctive relief is AFFIRMED.

42